# EXHIBIT A

# Supreme Court of Pennsylvania

## Court of Common Pleas
## Civil Cover Sheet

_____ Chester _____ **County**

| For Prothonotary Use Only: |
| --- |
| Docket No: |
| 2020 - 09428 - CT |

_The information collected on this form is used solely for court administration purposes.  This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court._

**SECTION A**

**Commencement of Action:**
- [X] Complaint
- [ ] Writ of Summons
- [ ] Petition
- [ ] Transfer from Another Jurisdiction
- [ ] Declaration of Taking

| Lead Plaintiff's Name: | Lead Defendant's Name: |
| --- | --- |
| HCOS Group, LLC, et al. | Eric Meyerhoff, ClaimDOC, LLC |

**Are money damages requested?** [X] Yes  [ ] No

Dollar Amount Requested: (check one)  [ ] within arbitration limits  [X] outside arbitration limits

**Is this a _Class Action Suit_?** [ ] Yes  [X] No

**Is this an _MDJ Appeal_?** [ ] Yes  [X] No

Name of Plaintiff/Appellant's Attorney:  Lauren P. McKenna, Samuel W. Cortes, Danielle E. Ryan

- [ ] Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)

**Nature of the Case**:  Place an "X" to the left of the **ONE** case category that most accurately describes your **_PRIMARY CASE._**  If you are making more than one type of claim, check the one that you consider most important.

**SECTION B**

**TORT** (_do not include Mass Tort_)
- [ ] Intentional
- [ ] Malicious Prosecution
- [ ] Motor Vehicle
- [ ] Nuisance
- [ ] Premises Liability
- [ ] Product Liability (_does not include mass tort_)
- [ ] Slander/Libel/ Defamation
- [ ] Other:
  _____
  _____

**MASS TORT**
- [ ] Asbestos
- [ ] Tobacco
- [ ] Toxic Tort - DES
- [ ] Toxic Tort - Implant
- [ ] Toxic Waste
- [ ] Other:
  _____
  _____

**PROFESSIONAL LIABLITY**
- [ ] Dental
- [ ] Legal
- [ ] Medical
- [ ] Other Professional:
  _____
  _____

**CONTRACT** (_do not include Judgments_)
- [ ] Buyer Plaintiff
- [ ] Debt Collection: Credit Card
- [ ] Debt Collection: Other
  _____
  _____
- [ ] Employment Dispute: Discrimination
- [X] Employment Dispute: Other
  ~~Breach of Contract~~
- [ ] Other:
  _____
  _____

**REAL PROPERTY**
- [ ] Ejectment
- [ ] Eminent Domain/Condemnation
- [ ] Ground Rent
- [ ] Landlord/Tenant Dispute
- [ ] Mortgage Foreclosure: Residential
- [ ] Mortgage Foreclosure: Commercial
- [ ] Partition
- [ ] Quiet Title
- [ ] Other:
  _____
  _____

**CIVIL APPEALS**
Administrative Agencies
- [ ] Board of Assessment
- [ ] Board of Elections
- [ ] Dept. of Transportation
- [ ] Statutory Appeal: Other
  _____
  _____
- [ ] Zoning Board
- [ ] Other:
  _____
  _____

**MISCELLANEOUS**
- [ ] Common Law/Statutory Arbitration
- [ ] Declaratory Judgment
- [ ] Mandamus
- [ ] Non-Domestic Relations Restraining Order
- [ ] Quo Warranto
- [ ] Replevin
- [ ] Other:
  _____
  _____

_Updated 1/1/2011_

# Chester County
# Court of Common Pleas
# Cover Sheet

| | |
|---|---|
| | Docket No: |

| Plaintiff(s): (Name, Address, Telephone) | Plaintiff's/Appellant's Attorney (circle one) |
|---|---|
| HCOS Group, LLC<br>1550 Liberty Ridge Drive<br>Suite 330, Wayne, PA  19087<br>(See caption for other Plaintiffs) | (Name, firm, address, telephone and attorney ID#)<br>Lauren P. McKenna, Samuel W. Cortes, Danielle E. Ryan, ID Nos. 59145/51494/314229<br>Fox Rothschild LLP, 747 Constitution Dr. Suite 100, Exton, PA 19341; 610-458-7500 |

| Defendant(s): (Name, Address, Telephone) | Are there any related cases? Please provide case nos. |
|---|---|
| Eric Meyerhoff<br>970 Green Pond Road<br>Newfoundland, NJ  07435<br>(See caption for other Defendant) | Yes - Chester County CCP Civil Action No. 2020-05003-CT, The Honorable William P. Mahon |

**Defendants who are proceeding without counsel are strongly urged to file with the Prothonotary a written statement of an address AND a telephone number at which they can be reached.**

**Commencement of Action (if applicable):**

☐ Agreement for an Amicable Action    ☐ Motion to Confirm Arbitration Award    ☐ Notice of Appeal

If this is an appeal from a Magisterial District Judgment, was appellant ☐ Plaintiff or ☐ Defendant in the original action?

| Jury Trial Demanded | ☐ Yes | ☑ No |
|---|---|---|

## Nature of case if not on previous cover sheet – Please choose the most applicable

| | | | |
|---|---|---|---|
| ☐ | Annulment | ☐ | Writ of Certiorari |
| ☐ | Custody · Conciliation Required | ☐ | Injunctive Relief |
| ☐ | Custody· Foreign Order | ☐ | Mechanics Lien Claim |
| ☐ | Custody - No Conciliation Required | ☐ | Issuance of Foreign Subpoena |
| ☐ | Divorce - Ancillary Relief Request | ☐ | Name Change |
| ☐ | Divorce - No Ancillary Relief Requested | ☐ | Petition for Structured Settlement |
| ☐ | Foreign Divorce | ☐ | Protection from Sexual Violence/Intimidation |
| ☐ | Foreign Protection from Abuse | | |
| ☐ | Paternity | | |
| ☐ | Protection from Abuse | | |
| ☐ | Standby Guardianship | | |

**Arbitration Cases Only**

Arbitration Date

Arbitration Time

Defendants are cautioned that the scheduling of an arbitration date does not alter the duty of the defendant to respond to the complaint and does not prevent summary disposition from occurring prior to the arbitration date.
This matter will be heard by a Board of Arbitrators at the time and date specified but, if one or more of the parties is not present at the hearing, the matter may be heard at the same time and date before a judge of the court without the absent party or parties.  There is no right to a trial *de novo* on appeal from a decision entered by a judge.

**Notice of Trial Listing Date**

Pursuant to C.C.R.C.P. 249.3, if this case is not subject to compulsory arbitration it will be presumed ready for trial twelve (12) months from the date of the initiation of the suit and will be placed on the trial list one (1) year from the date the suit was filed unless otherwise ordered by the Court.

To obtain relief from automatic trial listing a party must proceed pursuant to C.C.R.C.P. 249.3(b), request an administrative conference and obtain a court order deferring the placement of the case on the trial list until a later date.

**File with:** Chester County Justice Center, Prothonotary Office, 201 W. Market St., Ste. 1425, PO Box 2746, West Chester, PA 19380-0989

These cover sheets must be served upon all other parties to the action immediately after filing.
Submit enough copies for service.

**FOX ROTHSCHILD LLP**
BY:  Lauren P. McKenna, Esquire
        Samuel W. Cortes, Esquire
        Danielle E. Ryan, Esquire
IDENTIFICATION NOS.:  59145/91494/314229
EAGLEVIEW CORPORATE CENTER
747 CONSTITUTION DRIVE, SUITE 100
EXTON, PA  19341-0673
Telephone: (610) 458-7500
Facsimile: (610) 458-7337                        ATTORNEYS FOR PLAINTIFFS

HCOS GROUP, LLC
1550 Liberty Ridge Drive
Suite 330
Wayne, PA  19087,

        and

HCOS SERVICES, LLC
1550 Liberty Ridge Drive
Suite 330
Wayne, PA  19087,

        and

ELAP SERVICES, LLC
1550 Liberty Ridge Drive
Suite 330
Wayne, PA  19087,

        and

IMAGINE HEALTH, INC.
6995 South Union Park Center,
Building 5, Suite 140,
Cottonwood Heights, UT  84047,

               Plaintiffs,
    v.

ERIC MEYERHOFF
970 Green Pond Road
Newfoundland, NJ 07435,

        and

IN THE COURT OF COMMON PLEAS
CHESTER COUNTY, PENNSYLVANIA

CIVIL ACTION - LAW

NO. _____



CLAIMDOC, LLC
506 Third Street
Des Moines, IA  50309,

                    Defendants.

### NOTICE TO DEFEND

You have been sued in Court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the Court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so, the case may proceed without you and a judgment may be entered against you by the Court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

**Lawyer Referral Service**
**Chester County Bar Association**
**15 W. Gay Street**
**West Chester, Pennsylvania 19380**
**(610) 429-1500**

**FOX ROTHSCHILD LLP**
BY:  Lauren P. McKenna, Esquire
       Samuel W. Cortes, Esquire
       Danielle E. Ryan, Esquire
IDENTIFICATION NOS.:  59145/91494/314229
EAGLEVIEW CORPORATE CENTER
747 CONSTITUTION DRIVE, SUITE 100
EXTON, PA  19341-0673
Telephone: (610) 458-7500
Facsimile: (610) 458-7337                                    ATTORNEYS FOR PLAINTIFFS

HCOS GROUP, LLC,
1550 Liberty Ridge Drive
Suite 330
Wayne, PA  19087,

        and

HCOS SERVICES, LLC,
1550 Liberty Ridge Drive
Suite 330
Wayne, PA  19087,

        and

ELAP SERVICES, LLC,
1550 Liberty Ridge Drive
Suite 330
Wayne, PA  19087,

        and

IMAGINE HEALTH, INC.,
6995 South Union Park Center,
Building 5, Suite 140,
Cottonwood Heights, UT  84047,

               Plaintiffs,
   v.

ERIC MEYERHOFF,
970 Green Pond Road
Newfoundland, NJ 07435

        and

IN THE COURT OF COMMON PLEAS
CHESTER COUNTY, PENNSYLVANIA

CIVIL ACTION - LAW

NO. _____

CLAIMDOC, LLC,
506 Third Street
Des Moines, IA  50309,

                            Defendants.

## COMPLAINT

Plaintiffs, HCOS Group, LLC ("HCOS Group"), HCOS Services, LLC ("HCOS Services"), ELAP Services, LLC ("ELAP"), and Imagine Health, Inc. ("Imagine") (collectively, "Plaintiffs"), hereby file this Complaint against Defendants, Eric Meyerhoff ("Meyerhoff") and ClaimDOC, LLC ("ClaimDOC") (together, "Defendants").  In support, Plaintiffs allege as follows:

## THE PARTIES

1.      HCOS Group is a Delaware limited liability company with a principal place of business and headquarters located at 1550 Liberty Ridge Drive, Suite 330, Wayne, Pennsylvania 19087.

2.      HCOS Services is a Delaware limited liability company with a principal place of business and headquarters located at 1550 Liberty Ridge Drive, Suite 330, Wayne, Pennsylvania 19087.

3.      ELAP is a Delaware limited liability company with a principal place of business and headquarters located at 1550 Liberty Ridge Drive, Suite 330, Wayne, Pennsylvania  19087.

4.      Imagine is a Delaware corporation with a principal place of business at 6995 South Union Park Center, Building 5, Suite 140, Cottonwood Heights, Utah  84047.

5.      Meyerhoff is an adult individual and former employee of Plaintiffs who resides at 970 Green Pond Road, Newfoundland, New Jersey  07435.

2

6.      ClaimDOC is a limited liability company organized under the laws of the State of Iowa, which is registered to do business in Pennsylvania, and maintains a place of business of 506 Third Street, Des Moines, Iowa  50309.

## JURISDICTION AND VENUE

7.      Jurisdiction exists pursuant to 42 Pa. C.S. § 931.

8.      Venue is proper in Chester County because (1) Meyerhoff agreed to subject himself to jurisdiction and venue in Chester County, (2) substantial acts giving rise to the causes of action set forth herein occurred in Chester County, and (3) upon information and belief, Defendants regularly conduct business in Chester County.  [See Confidentiality Agreement (defined below and attached as Exhibit B), ¶ 7.6 ("Employee hereby expressly consents to the personal jurisdiction of the state and federal courts located in Pennsylvania for the resolution of any and all disputes arising from or relating to this Agreement.")].

## BACKGROUND

9.      HCOS Group, with its affiliated entities, including ELAP and Imagine, assists middle market and local government employers that offer health benefits through self-funded plans, by developing transparent, rational methods of reimbursing medical providers.

10.     Imagine establishes partnerships with high-performing hospital systems through the United States in key markets, which enables Plaintiffs' clients to access high-quality health care at a low cost.

11.     ELAP is the founder and industry leader of "reference-based pricing," which is a cost-containment strategy that pays doctors, labs, clinics, and hospitals a percentage of an established benchmark.  ELAP sells its services to customers nationwide, helping hundreds of companies save millions of dollars in healthcare-related costs.

3

12.     HCOS Services is a shared services subsidiary, through which all employees of

HCOS Group, and its affiliated entities (including ELAP and Imagine) are paid.

13.     Plaintiffs sell their services and products, including, but not limited to, those

identified above, in markets across the country, by maintaining and developing relationships with

brokers and third-party administrator partners, among other things.

14.     Plaintiffs employ approximately 155 people in Chester County, Pennsylvania.

15.     ClaimDOC operates out of Iowa.

16.     ClaimDOC competes with Plaintiffs in the same markets, offering products and

services that it purports are similar to those offered by Plaintiffs.

17.     Both ClaimDOC and Plaintiffs, through ELAP, provide reference-based pricing

services to employers in markets across the country.

18.     From May 21, 2019, until November 27, 2020, Plaintiffs employed Meyerhoff as

Director of Business Development before Meyerhoff abruptly terminated his employment after

he previously accepted an offer of employment from ClaimDOC, a direct competitor of

Plaintiffs, in violation of a 12-month non-competition agreement more specifically addressed

below.

19.     In fact, for months before terminating his employment with Plaintiffs, Meyerhoff

began working for ClaimDOC's sales team in competition with Plaintiffs, while he remained on

Plaintiffs' payroll.

20.     During his employment with Plaintiffs, Meyerhoff utilized Plaintiffs' confidential

information and trade secrets, including, but not limited to, confidential and proprietary sales and

marketing information, current and prospective customer information, and other proprietary

business development information.

21.     Meyerhoff misappropriated Plaintiffs' confidential and trade secret information both before and after his employment with Plaintiffs terminated, to unfairly compete against Plaintiffs.

22.     Plaintiffs file this Complaint seeking injunctive relief that will preclude Meyerhoff from violating the non-competition covenant and preclude Defendants from further utilizing Plaintiffs' confidential information and trade secrets to Plaintiffs' detriment, and monetary damages.

## Plaintiffs Hire Meyerhoff

23.     On May 21, 2019, Plaintiffs offered Meyerhoff the position of Director of Business Development at Plaintiffs, contingent upon, among other things, Meyerhoff's acceptance in full of the terms of a confidentiality agreement (the "Confidentiality Agreement"). [See Offer Letter to Meyerhoff dated May 21, 2019, attached as **Exhibit A**].

24.     On May 21, 2019, Meyerhoff agreed to the terms of the Confidentiality Agreement.  [See Confidentiality Agreement, attached as **Exhibit B**].

25.     The Confidentiality Agreement provides, in pertinent part, as follows:

1.1     **Confidential Information.**  Employee recognizes that the Company now possess or will possess information of a confidential or secret nature which has commercial value in the business in which the Company is engaged (hereinafter referred to as "Confidential Information").  Confidential Information for this purpose includes but is not limited to trade secrets, business strategies, processes, data, know-how, inventions, improvements, techniques, formulas, marketing plans, product plans, forecasts, discounts, pricing lists, client and customer lists, and other information relating to the purpose, benefits, use and operations of the Company, whether belonging to the Company or to any of its customers or suppliers. Employee understands that employment with the Company creates a relationship of trust and confidence between Employee and the Company with respect to the Confidential Information that Employee may learn or develop during the period of employment with the Company.

A.    Company Information

Employee agrees at all times during the term of any employment and thereafter, to hold in strictest confidence and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation, without written authorization of the Company's CEO, any Confidential Information of the Company.

1.3    **Obligations Not to Disclose.**  At all times, both while employed with the Company and after the termination of my employment with the Company, Employee will keep in strict confidence all Confidential Information and Employee will not use or disclose any Confidential Information or anything relating to it in whole or in part, nor permit others to use or disclose it in any way, without prior written consent of the Company, except as may be necessary in the ordinary course of performing my duties as an employee of the Company.

1.4    **Obligations upon Termination of Employment.**  Upon termination of employment with the Company for any reason, Employee will promptly deliver to the Company all materials, documents, data, equipment, and other physical property of any nature containing or pertaining to any Confidential Information, and Employee will not take from the Company's premises any such material or equipment or any reproduction thereof.

[Ex. B, ¶¶ 1.1-1.5].

26.    The Parties also agreed to the following non-competition and non-solicitation provisions in the Confidentiality Agreement:

2.1    **Non-Competition.**  In consideration for and as an inducement to Company to enter into this Agreement, Employee covenants and agrees that during the service and for a period of twelve (12) months following the termination thereof for any reason (the "Non-Compete Period"), Employee shall not, directly or indirectly, anywhere in the Restricted Area, either for Employee or through any other person, have an ownership interest in, manage, participate, operate, control, permit his or her name to be used by, perform services for or otherwise become involved in (whether as an officer, director, manager, employee, investor, partner, proprietor, stockholder, member, trustee, consultant, agent, representative, broker, promoter or otherwise), any Competing Business. ... For the purpose of this Agreement, the term (x) "Competing Business" shall mean any business that develops, sells or otherwise provides any services that compete with (A) products or services developed, sold or otherwise provided by Company during the three (3) year period prior to the date of the termination of my service; or (B) products or services specifically planned to be developed, sold or otherwise provided by Company in the future as documented by a written plan or disclosed to myself as Confidential Information within the two (2) year period prior to the date of the termination of my service, and (y) "Restricted Area" shall mean all states, territories (and the

6

District of Columbia, as applicable) in which Company conducted business during the four (4) year period prior to the date of the termination of my service and all states and territories (and the District of Columbia, as applicable) in which Employee called on customers or performed other services for Company during the same period.

[Exhibit B, ¶ 2.1 (the "Non-Compete Provision")].

2.2 **Non-Solicitation and Non-Interference.** During the Restricted Period, Employee will not, directly or indirectly, either for Employee or through any other person or entity, (i) induce or attempt to induce any current or former (within the past twelve (12) month period) employee to leave the employ of Company, or in any way interfere with the relationship between such employee and Company, (ii) hire any current or former employee (within the past twelve (12) month period) of Company or (iii) call on, solicit or service any current Company customer or client or competitive with those Services offered by ELAP during the two (2) year period prior to the date of the termination of service or induce or attempt to induce such person to cease doing or decrease its business with Company, or in any way interfere with the relationship between any customer, vendor, broker, third-party administrator or other business relation and Company (including making any negative statement or communication that is intended to or could reasonably be expected to disparage Company).

[Id., ¶ 2.2 (the "Non-Solicit Provision")].

27. Meyerhoff accepted Plaintiffs' offer of employment, subject to the Confidentiality Agreement, and began working for Plaintiffs as Director of Business Development.

28. As Director of Business Development for Plaintiffs, Meyerhoff was responsible for all aspects of maintaining and developing Plaintiffs' relationships with its customers, brokers, and third-party administrator partners.

29. Meyerhoff was also tasked with expanding Plaintiffs' footprint across the United States and with developing and executing Plaintiffs' sales and marketing strategies, which included cultivating broker relationships, developing sales leads provided to him by ELAP, and identifying and developing relationships with prospective clients, brokers, and third-party administrator partners on a nationwide basis.

7

30.     Meyerhoff was responsible for developing long-term relationships with brokers and third-party administrator partners, who would recommend Plaintiffs' services over other competitors or traditional network plans offered by health insurance carriers.

31.     Meyerhoff was also responsible for maintaining and expanding relationships with the decision makers of Plaintiffs' customers, potential customers, brokers, and third-party administrator partners, through regular personal contact and served as the primary point of contact on behalf of Plaintiffs.

32.     Meyerhoff developed relationships with the entities and individuals described in paragraph nos. 29-31 above at Plaintiffs' expense, and only by virtue of his employment with Plaintiffs.

33.     During his employment with Plaintiffs, in reliance on the promises made by Meyerhoff in the Confidentiality Agreement and his fiduciary obligations, Plaintiffs granted Meyerhoff access, and Meyerhoff was regularly exposed, to Plaintiffs' confidential, proprietary, and trade secret information.

34.     Specifically, Meyerhoff had direct, continuous, and extensive access to, and acquired considerable knowledge concerning, Plaintiffs' confidential customer lists, prospect lists, broker lists, marketing strategies, business development proposals, pricing strategies, customer preferences, costs and processes, profit margins, confidential information relating to Plaintiffs' third-party administrator partners, and other confidential business information and trade secrets.

35.     With the access described in paragraph no. 34 above, Meyerhoff became directly knowledgeable of Plaintiffs' clients, their needs, and their future plans; with Plaintiffs'

prospective clients and business development efforts; and with the secret and proprietary methods and processes used by Plaintiffs in the conduct of its business.

36.     Moreover, Meyerhoff acquired personal knowledge of, and a deep familiarity with, the representatives of Plaintiffs' clients and prospective clients, including those persons responsible for deciding whether to enter into business relationships with Plaintiffs.

37.     During the term of his employment, Meyerhoff also knew of valid business expectancies and contracts between Plaintiffs and its clients and customers.

38.     Plaintiffs have incurred substantial expense since their inception in the establishment, development, and maintenance of their customer lists and relationships, as well as in the identification and development of business prospects, which has allowed them to grow their business to the successful national platform that it now occupies.

39.     Plaintiffs develop business relationships and prospects through, among other things, procuring leads, researching potential customers and their needs, identifying decision-makers, compiling contact information, developing proposals and pricing information, closing sales, and keeping informed of customers' ongoing and future requirements.  This process requires a tremendous commitment of time and resources to narrow publicly-available lists of business leads into a much smaller field of viable prospects, and an even smaller group of actual customers.  Accordingly, Plaintiffs' confidential and trade secret lists of customers and prospects confer a significant competitive advantage.

40.     Plaintiffs treat their relationships with current and prospective customers, brokers, and third party administrators with the highest degree of confidentiality, and such relationships and lists constitute valuable and unique assets of Plaintiffs that are not publicly known or readily

9

ascertainable. Each customer relationship and prospect additionally constitutes a prospective economic advantage.

41.     Plaintiffs have also incurred substantial expense and investment over the years in the research, development, and implementation of their proprietary processes, methods, and pricing, and said information constitutes not only a current but also a prospective economic advantage. Access to and use of Plaintiffs' proprietary processes, methods, and pricing are legitimate business interests that Plaintiffs have reasonably sought to protect.

42.     Plaintiffs have sought to maintain the confidentiality of their proprietary information and trade secrets. In addition to enforcing their various policies, including, but not limited to, the policies set forth in the Confidentiality Agreement, their acceptable use policy, and their employee code of conduct, Plaintiffs maintain security at all of their offices, including requiring the use of keys/passcards to enter their offices; limiting access to confidential and proprietary information to those with a need to know; requiring employees to keep highly confidential and proprietary information locked in their desks or filing cabinets; and requiring employees to use an individual password to enter Plaintiffs' computer network. Additionally, Plaintiffs audit and track access to their Confidential Information, including, but not limited to, monitoring computer systems after an employee leaves the employment relationship with Plaintiffs.

43.     As a result of Plaintiffs' actions, Plaintiffs' proprietary information and trade secrets are not readily available to the general public, have not become general knowledge in the health benefits industry, and the disclosure of such information and trade secrets to Plaintiffs' competitors would have a detrimental impact upon the economic health of Plaintiffs.

**Meyerhoff Ostensibly Resigns**

44.     On November 27, 2020, without any notice to Plaintiffs, Meyerhoff abruptly resigned his employment with Plaintiffs as Director of Business Development.

45.     Also on November 27, 2020, Ms. Amy Pellegrin, Chief Legal Officer for ClaimDOC, sent a letter to Troy Sisum, Senior Vice President and Chief Counsel for Plaintiffs, claiming that ClaimDOC had hired Meyerhoff, effective December 1, 2020.  [See **Exhibit C**].

46.     On November 30, 2020 and December 3, 2020, Plaintiffs wrote to Meyerhoff and ClaimDOC, respectively, reminding them that the Confidentiality Agreement barred Meyerhoff from (a) disclosing any of Plaintiffs' confidential information, (b) competing with Plaintiffs, or (c) soliciting any of Plaintiffs' customers, and requesting information from Meyerhoff and ClaimDOC.  [See Letter to Meyerhoff, dated November 30, 2020, attached as **Exhibit D**; Letter to ClaimDOC, dated December 3, 2020, attached as **Exhibit E**].

47.     On December 8, 2020, counsel for Meyerhoff responded by denying that Meyerhoff had taken any of Plaintiffs' information and insisting that Meyerhoff had not violated the Non-Compete and Non-Solicitation Provisions.  [See Email exchange dated December 10-11, 2020, attached as **Exhibit F**].

48.     Upon information and belief, the December 8, 2020 communication from counsel for Meyerhoff was evasive and misleading, and did not meaningfully address whether Meyerhoff had in fact taken information belonging to Plaintiffs to ClaimDOC.

49.     ClaimDOC never responded to Plaintiffs at all.

50.     ClaimDOC recruited and hired Meyerhoff knowing that ClaimDOC's employment of Meyerhoff violated the Non-Compete and Non-Solicitation Provisions.

51.     In fact, Ms. Pellgrin admitted that ClaimDOC's hiring of Meyerhoff violates the

terms of the Non-Compete and Non-Solicitation Provisions.  [See **Exhibit C**].

52.     Ms. Pellegrin argues, however, that the Non-Compete and Non-Solicitation

Provisions should not be enforced as written.  [Id.]

### Meyerhoff's Corporate Espionage Months

53.     Upon information and belief, Meyerhoff accepted an offer of employment from

ClaimDOC months before he terminated his employment with Plaintiffs.

54.     During these Corporate Espionage, ClaimDOC invited Meyerhoff to internal

ClaimDOC sales meetings.

55.     During these Corporate Espionage Months, ClaimDOC provided Meyerhoff his

own ClaimDOC email address and account.

56.     Upon information and belief, Meyerhoff attended meetings of ClaimDOC's sales

team while still employed by Plaintiffs.

57.     Upon information and belief, Meyerhoff participated in ClaimDOC's sales efforts

while still employed by Plaintiffs.

58.     During the Corporate Espionage Months, Meyerhoff improperly accessed

Plaintiffs' Confidential Information.

59.     For example, on November 11, 2020, Meyerhoff improperly accessed detailed

financial information prepared by Plaintiffs for Plaintiffs' clients.

60.     Meyerhoff also accessed Confidential Information prepared by Plaintiffs

assessing its competitors, including ClaimDOC.

61.     Meyerhoff also accessed Confidential Information prepared by Plaintiffs

concerning markets that he did not service for Plaintiffs.

12

62.     Meyerhoff had no legitimate need or reason to access the above-identified Confidential Information in the course of his duties for Plaintiffs.

63.     Upon information and belief, Meyerhoff acquired the above-described competitively sensitive Confidential Information for purposes of disclosing it to ClaimDOC and for use in unfairly competing against Plaintiffs.

### The ClaimDOC Agenda

64.     Upon information and belief, ClaimDOC targeted Meyerhoff for a role as a ClaimDOC corporate spy for purposes of stealing Plaintiffs' business.

65.     Upon information and belief, the above-described conduct by Meyerhoff and ClaimDOC is part of a playbook that ClaimDOC is using to attempt to steal Plaintiff's business.

66.     ClaimDOC intends to build its sales force by poaching Plaintiffs' key employees to unfairly obtain the benefit of the relationships that Plaintiffs paid those key employees to develop for Plaintiffs and Plaintiffs' proprietary and confidential information.

67.     This is the second time in three months that ClaimDOC has induced one of Plaintiffs' key sales employees to work for ClaimDOC in violation of obligations owed to Plaintiffs.

68.     Plaintiffs' sales staff is small, consisting of approximately twenty people, and upon information and belief ClaimDOC's sale staff is even smaller. Given the small size of the sales groups, each employee poached by ClaimDOC causes significant harm to Plaintiffs.

69.     On July 24, 2020, Plaintiffs learned that another employee, Arif, had resigned from his position to accept a position with ClaimDOC.

70.     Like Meyerhoff, Arif had been employed by Plaintiffs as Director of Business Development.

71.     As with Meyerhoff, Plaintiffs discovered that Arif had improperly accessed and disclosed Plaintiffs' Confidential Information, both prior to and after the termination of his employment with Plaintiffs.  The information accessed by Arif was entirely unrelated to his duties as Director of Business Development, and Arif had no legitimate purpose in accessing it.

72.     On August 4, 2020, Plaintiffs filed suit against Arif and ClaimDOC in the matter captioned as <u>HCOS Group, LLC v. Omar Arif</u>, Chester County Court of Common Pleas No. 2020-05003-CT (the "Arif Litigation"), which the parties resolved pursuant to a written Settlement Agreement dated September 9, 2020.

73.     On November 2, 2020, Plaintiffs filed suit against Arif and ClaimDOC, alleging that Arif and ClaimDOC had breached the terms of the Settlement Agreement by soliciting Brokers (as defined in the Settlement Agreement) in violation of the non-competition provisions set forth in the Settlement Agreement.  Plaintiffs' claims relating to Arif and ClaimDOC's breaches of the Settlement Agreement remain pending.

74.     Meyerhoff has been an active member of ClaimDOC's sales team since early September 2020, even though he did not resign from his employment relationship with Plaintiffs until November 27, 2020.

75.     Meyerhoff is represented by the exact same counsel in this lawsuit as is Arif in the Arif Litigation.

76.     Upon information and belief, ClaimDOC has paid and is paying for the representation of Meyerhoff and Arif in response to the claims asserted by Plaintiffs.

77.     Likewise, ClaimDOC has retained the same counsel to represent it in this dispute as the counsel it utilized in the Arif Litigation.

78.     ClaimDOC's actions, both with respect to Meyerhoff and Arif, constitute a clear pattern of conduct involving the exact same scheme, the similar tactics, and the exact same personnel aimed at acquiring Plaintiffs' business by theft.

79.     Upon information and belief, Defendants have used and are using Plaintiffs' confidential and proprietary information and trade secrets for purposes of targeting and soliciting Plaintiffs' current and potential customers, brokers, and third-party administrator partners, to induce them to terminate their relationships with Plaintiffs in favor of ClaimDOC.

80.     Upon information and belief, Defendants have continued their misappropriation of Plaintiffs' proprietary and confidential information and trade secrets for purposes of obtaining an unfair competitive advantage over Plaintiffs.

81.     Defendants' misappropriation of Plaintiffs' Confidential Information is an unlawful attempt to capitalize on Plaintiffs' substantial investment in proprietary and confidential business methods, marketing strategy, and client and partner relationships.

82.     Defendants' improper conduct, and its inevitable continuation, interferes with the conduct of Plaintiffs' business, irreparably harms and damages Plaintiffs' business, places Plaintiffs' confidential and proprietary information and trade secrets at risk, and places Plaintiffs at a competitive disadvantage.

83.     On December 22, 2020, Defendants sent an email to Plaintiffs' customers, referral sources, business partners, and Plaintiffs' own employees, including, but not limited to those with whom Meyerhoff worked while employed by Plaintiffs, soliciting business in violation of the Confidentiality Agreement. [See, e.g., Solicitation Communication, attached as **Exhibit G**].

84.     As such, it became evident on December 22, 2020, that Plaintiffs will suffer irreparable harm immediately if injunctive relief does not issue, including, but not limited to, lost

market advantage, damaged or lost referral and customer relationships, and lost goodwill, because no adequate remedy at law will prevent further wrongdoing and restore the *status quo* that existed before Defendants' unlawful conduct.

## COUNT I – BREACH OF CONTRACT (CONFIDENTIALITY AGREMENT)
### Plaintiffs v. Meyerhoff

85.    Plaintiffs incorporate the foregoing paragraphs as if the same were set forth fully herein.

86.    The Confidentiality Agreement is a valid and binding contract.

87.    Meyerhoff breached the Confidentiality Agreement by disclosing Plaintiff's confidential information to third parties, including, without limitation, ClaimDOC, without Plaintiffs' authorization or consent.  [Exhibit A, ¶¶ 1.1-1.4].

88.    Meyerhoff further breached the Non-Compete Provision of the Confidentiality Agreement by entering into an employment relationship with ClaimDOC, a direct competitor of Plaintiffs, within days after the termination of his employment with Plaintiffs within the "Restricted Territory."  [Id., ¶ 2.1].

89.    Additionally, Meyerhoff breached the Non-Solicit Provision of the Confidentiality Agreement by soliciting Plaintiffs' current and potential customers, brokers, referral sources, third-party administrator partners, and Plaintiffs' own employees, on behalf of ClaimDOC.  [Id., ¶ 2.2].

90.    As a result of Meyerhoff's breaches of the Confidentiality Agreement, Plaintiffs have suffered damages in excess of $50,000.00, in addition to lost market advantage, reputation, and goodwill, which losses cannot be compensated by money damages alone.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and against Meyerhoff for preliminary and permanent injunctive relief, compensatory

damages in excess of $50,000.00, attorneys' fees, costs, and any other damages that the Court deems fair and reasonable.

### COUNT II – BREACH OF CONTRACT (COMPENSATION PLAN)
**Plaintiffs v. Meyerhoff**

91.     Plaintiffs incorporate the foregoing paragraphs as if the same were set forth fully herein.

92.     The Compensation Plan between Plaintiffs and Meyerhoff is a valid and binding contract.[1]

93.     Meyerhoff breached the Compensation Plan by failing to repay Plaintiffs $24,000.00 in advanced commissions that were loaned to him, which Meyerhoff did not earn.

94.     As a result of Meyerhoff's breaches of the Compensation Plan, Plaintiffs have suffered damages.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and against Meyerhoff for damages of $24,000.00, attorneys' fees, costs, and any other damages that the Court deems fair and reasonable.

### COUNT III – BREACH OF FIDUCIARY DUTY (DUTY OF LOYALTY)
**Plaintiffs v. Meyerhoff**

95.     Plaintiffs incorporate the foregoing paragraphs as if the same were set forth fully herein.

96.     During the term of his employment with Plaintiffs, Meyerhoff owed Plaintiffs a fiduciary duty of loyalty.

---

[1] Plaintiffs have not attached a copy of the compensation plan to this Complaint because it is a confidential document and Defendants both possess a copy of the compensation plan.

97.     During the term of his employment with Plaintiffs, Meyerhoff acted contrary to Plaintiffs' interests, as set forth fully above, by actively working with and for Plaintiffs' competitor, ClaimDOC, while employed by Plaintiffs, by misappropriating Plaintiffs' confidential information and trade secrets, and soliciting Plaintiffs' customers on behalf of ClaimDOC.

98.     During the term of his employment with Plaintiffs, Meyerhoff acted in direct competition with Plaintiffs.

99.     Meyerhoff's breaches of his duty of loyalty to Plaintiffs have caused Plaintiffs to suffer in excess of $50,000.00, in addition to lost market advantage, reputation, and goodwill, which losses cannot be compensated by money damages alone.

100.    Meyerhoff's breaches of his duty of loyalty were undertaken with malice and/or reckless indifference to Plaintiffs' rights.

**WHEREFORE**, Plaintiffs respectfully requests that the Court enter judgment in its favor and against Meyerhoff for preliminary and permanent injunctive relief, compensatory damages in excess of $50,000.00, punitive damages, attorneys' fees, costs, and any other damages that the Court deems fair and reasonable.

### COUNT IV – AIDING AND ABETTING
### BREACH OF FIDUCIARY DUTY (DUTY OF LOYALTY)
### Plaintiffs v. ClaimDOC

101.    Plaintiffs incorporate the foregoing paragraphs as if the same were set forth fully herein.

102.    As set forth more fully above, Meyerhoff breached the fiduciary duty of loyalty that he owes to Plaintiffs.

18

103.    At all relevant times, ClaimDOC knowingly participated in, and gave substantial assistance or encouragement to, Meyerhoff's breach of his fiduciary duty of loyalty that he owed to Plaintiffs, by encouraging and assisting Meyerhoff in competing with Plaintiffs while employed by Plaintiffs, misappropriating Plaintiffs' confidential, proprietary, and trade secret information, and soliciting Plaintiffs' customers, brokers, and third-party administrator partners on ClaimDOC's behalf.

104.    As a direct and proximate result of ClaimDOC's wrongful aiding and abetting of Meyerhoff's breach of his fiduciary duty of loyalty, Plaintiffs have suffered damages in excess of $50,000.00, in addition to lost market advantage, reputation, and goodwill, which losses cannot be compensated by money damages alone.

105.    ClaimDOC's aiding and abetting of Meyerhoff's breaches of his duty of loyalty was undertaken with malice and/or reckless indifference to Plaintiffs' rights.

**WHEREFORE**, Plaintiffs respectfully requests that the Court enter judgment in its favor and against ClaimDOC for preliminary and permanent injunctive relief, compensatory damages in excess of $50,000.00, punitive damages, attorneys' fees, costs, and any other damages that the Court deems fair and reasonable.

### COUNT V – VIOLATION OF THE PENNSYLVANIA UNIFORM TRADE SECRETS ACT, 12 PA. C.S. § 5301, et seq.
#### Plaintiffs v. Defendants

106.    Plaintiffs incorporates the foregoing paragraphs as if the same were set forth fully herein.

107.    Plaintiffs' customer lists, non-public prospect lists, customer names and contact information, customer needs and preferences, pricing information, marketing strategies and materials, broker lists, confidential information relating to Plaintiffs' third-party administrator

partners, business methods, business development plans, and other confidential business information constitute trade secrets within the meaning of the Pennsylvania Uniform Trade Secrets Act (the "PUTSA"), 12 Pa. C.S. §§ 5301, et seq.

108.   Plaintiffs undertake measures to maintain the confidentiality of their trade secret information, which measures are known to Meyerhoff.

109.   Defendants misappropriated and used Plaintiffs' confidential and proprietary information and trade secrets without Plaintiffs' express or implied consent.

110.   Defendants used improper means, including, without limitation, unauthorized solicitation of sensitive information and breaches of Meyerhoff's duty of loyalty, to acquire Plaintiffs' confidential and proprietary information and trade secrets.

111.   Defendants' misappropriation of Plaintiffs' confidential and proprietary information and trade secrets has caused Plaintiffs to suffer damages in excess of $50,000.00, in addition to lost market advantage, reputation, and goodwill.

112.   Defendants' conduct was undertaken with malice and/or reckless indifference to Plaintiffs' rights.

113.   As a result of Defendants' willful and malicious misappropriation of Plaintiffs' trade secrets, Plaintiffs are entitled to the recovery of their reasonable attorneys' fees, expenses, and costs.  See 12 Pa. C.S.A. § 5305.

**WHEREFORE**, Plaintiffs respectfully requests that the Court enter judgment in its favor and against Defendants, jointly and severally, for preliminary and permanent injunctive relief, compensatory damages in excess of $50,000.00, punitive damages, attorneys' fees, costs, and any other damages that the Court deems fair and reasonable.

## COUNT VI – TORTIOUS INTERFERENCE WITH
## PLAINTIFFS' CONTRACTUAL RELATIONSHIPS WITH THEIR CUSTOMERS,
## BROKERS, AND THIRD-PARTY ADMINISTRATOR PARTNERS
### Plaintiffs v. Defendants

114.    Plaintiffs incorporate the foregoing paragraphs as if the same were set forth fully herein.

115.    Plaintiffs have valid contractual relationships and/or prospective contractual relationships with their customers, brokers, third-party administrator partners, and non-public business prospects.

116.    Meyerhoff knew of Plaintiffs' contracts and relationships with its customers, brokers, third-party administrator partners, as well as Plaintiffs' prospective contractual relationships.

117.    Meyerhoff improperly disclosed information regarding Plaintiffs' current and prospective customers, brokers, and third-party administrator partners to ClaimDOC so that Defendants could unfairly compete with Plaintiffs in the marketplace.

118.    Defendants intentionally interfered with Plaintiffs' contracts with its current and prospective customers, brokers, and third-party administrator partners, in a manner that induced a breach of said contracts, relationships, and/or prospective relationships.

119.    Defendants' intentional interference with Plaintiffs' current and prospective customer, broker, and third-party administrator partner relationships was without justification or excuse, in that Defendants were improperly motivated to harm Plaintiffs and further used wrongful means.

120.    Defendants' tortious interference with Plaintiffs' contractual relationships and/or prospective contractual relationships has caused Plaintiffs to suffer damages in excess of

$50,000.00, in addition to lost market advantage, reputation, and goodwill, which losses cannot be compensated by money damages alone.

121.     Defendants' conduct was undertaken with malice and/or reckless indifference to Plaintiffs' rights.

**WHEREFORE**, Plaintiffs respectfully requests that the Court enter judgment in their favor and against Defendants, jointly and severally, for preliminary and permanent injunctive relief, compensatory damages in excess of $50,000.00, punitive damages, attorneys' fees, costs, and any other damages that the Court deems fair and reasonable.

### COUNT VII – TORTIOUS INTERFERENCE WITH
### PLAINTIFFS' CONTRACTUAL RELATIONSHIP WITH MEYERHOFF
### Plaintiffs v. ClaimDOC

122.     Plaintiffs incorporates the foregoing paragraphs as if the same were set forth fully herein.

123.     As set forth above, Plaintiffs have a valid contractual relationship with Meyerhoff pursuant to the Confidentiality Agreement, which prohibits Meyerhoff from working for a direct competitor, improperly using or disclosing Plaintiffs' confidential information, and soliciting Plaintiffs' current and potential customers, brokers, and third-party administrators.

124.     ClaimDOC knew of Plaintiffs' contractual relationship with Meyerhoff and has acknowledged its validity.  [See Exhibit C].

125.     Despite ClaimDOC's knowledge of Meyerhoff's contractual relationship with Plaintiffs, ClaimDOC intentionally interfered with Plaintiffs and Meyerhoff's relationship in a manner that induced a breach of the Confidentiality Agreement.

22

126.    ClaimDOC's intentional interference with Plaintiffs' contractual relationship with Meyerhoff was without justification or excuse, in that ClaimDOC was improperly motivated to harm Plaintiffs and further used wrongful means.

127.    ClaimDOC's tortious interference with Plaintiffs' contractual relationship with Meyerhoff has caused Plaintiffs to suffer damages in excess of $50,000.00, along with lost market advantage, reputation, and goodwill, which losses cannot be compensated by money damages alone.

128.    ClaimDOC's conduct was undertaken with malice and/or reckless indifference to Plaintiffs' rights.

**WHEREFORE**, Plaintiffs respectfully requests that the Court enter judgment in their favor and against ClaimDOC for preliminary and permanent injunctive relief, compensatory damages in excess of $50,000.00, punitive damages, attorneys' fees, costs, and any other damages that the Court deems fair and reasonable.

### COUNT VIII – AIDING AND ABETTING TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS
#### Plaintiffs v. Defendants

129.    Plaintiffs incorporates the foregoing paragraphs as if the same were set forth fully herein.

130.    As set forth above, Defendants interfered in Plaintiffs' contractual relationships with their current and prospective customers, brokers, and third-party administrators, by, among other things, disclosing Plaintiffs' confidential and proprietary information regarding the same so that Defendants could unfair compete with Plaintiffs in the marketplace.

131.    Additionally, ClaimDOC intentionally interfered in Plaintiffs' contractual relationship with Meyerhoff by inducing Meyerhoff to breach the Confidentiality Agreement.

23

132.    Defendants aided and abetted each other in their intentional interference with Plaintiffs' contractual relationships.

133.    As a result of Defendants' wrongful conduct, Plaintiffs have suffered damages in excess of $50,000.00, along with lost market advantage, reputation, and goodwill, which losses cannot be compensated by money damages alone.

134.    Defendants' conduct was undertaken with malice and/or reckless indifference to Plaintiffs' rights.

**WHEREFORE**, Plaintiffs respectfully requests that the Court enter judgment in their favor and against Defendants, jointly and severally, for preliminary and permanent injunctive relief, compensatory damages in excess of $50,000.00, punitive damages, attorneys' fees, costs, and any other damages that the Court deems fair and reasonable.

### COUNT IX – UNFAIR COMPETITION
### Plaintiffs v. Defendants

135.    Plaintiffs incorporates the foregoing paragraphs as if the same were set forth fully herein.

136.    As set forth above, Defendants intentionally diverted business away from Plaintiffs and to Defendants through wrongful means, including, but not limited to, through Meyerhoff's breaches of his fiduciary duty of loyalty and by misappropriating Plaintiffs' confidential, proprietary, and trade secret information.

137.    As a direct and proximate result of the foregoing wrongful conduct, Plaintiffs have suffered damages in excess of $50,000.00, along with lost market advantage, reputation, and goodwill, which losses cannot be compensated by money damages alone.

138.    Defendants' conduct was undertaken with malice and/or reckless indifference to Plaintiffs' rights.

24

**WHEREFORE**, Plaintiffs respectfully requests that the Court enter judgment in their favor and against Defendants for preliminary and permanent injunctive relief, compensatory damages in excess of $50,000.00, punitive damages, attorneys' fees, costs, and any other damages that the Court deems fair and reasonable.

Dated:  December 23, 2020

**FOX ROTHSCHILD LLP**

By:/s/ Lauren P. McKenna
    Lauren P. McKenna, Esquire
    Samuel W. Cortes, Esquire
    Danielle E. Ryan, Esquire
    Attorney I.D. Nos. 59145/91494/314229
    747 Constitution Drive
    Exton, PA  19341
    Telephone:  610-458-7500

    *Counsel for Plaintiffs*

25

**VERIFICATION**

I, Tom Wittick, hereby state that I am authorized to make this Verification on behalf of Plaintiffs in my role as Senior Vice President, Growth.  I have read the foregoing Complaint and I know the contents thereof.  The statements contained in the foregoing Complaint are true and correct to the best of my knowledge, except to those matters stated on information and belief, and as to those matters, I believe them to be true.  I further understand that false statements herein made are subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities.

By:  Tom Wittick

Dated:  December      , 2020

# EXHIBIT  A



May 21, 2019

Eric Meyerhoff
970 Green Pond Road
NewFoundland, NJ  07435

Re:  Offer of Employment at ELAP Services LLC

Dear Eric:

I am pleased to present this offer of employment to you at ELAP Services LLC for the position of Director, Business Development. This is an Exempt position with a non-recoverable draw of one seventy-five thousand dollars ($175,000) and eligible for commission (see attached commission structure) based on achievement of individual objectives established at time of employment. For a period of twelve months, total compensation will be guaranteed at two hundred seventy-five thousand dollars ($275,000) payable bi-weekly. Additionally, you will be eligible for two additional bonuses based on key milestones as noted below:

- Close 500 ees on or before 12/1/2019 = $25,000 (trigger is based on verbal commitment followed by email confirmation of close documented in Salesforce
- Pipeline development – Documented in Salesforce
  - 10,000 ees in pipeline by 9/1/2019 = $10,000
    - Pipeline must include employer details, broker, key contacts at employer, employee eligible to participate and products being proposed
  - 20,000 ees in pipeline by 1/1/2020 = $15,000
    - Pipeline must include employer details, broker, key contacts at employer, employee eligible to participate and products being proposed


This offer is contingent upon successful reference and background check results and execution of ELAP Services' confidentiality agreement. Included in this offer of employment is twenty-two (22) days of paid time off (PTO) during the first twelve months of employment and 10 paid holidays.  At this time, ELAP also covers the cost of the employee's medical, vision and dental coverage, (with option to purchase coverage for family members – with a 40% cost share to employees) life & disability insurance, offers a 401(k) Safe Harbor program, and wellness incentives.

While ELAP Services' goal is an ongoing, mutually rewarding employment relationship with every employee, ELAP does not enter into employment agreements for fixed terms.  Employment is at-will, which means that both the employee and ELAP retain the right to terminate the employment relationship at any time, with or without cause.

We are looking forward to having you as part of our organization and propose a starting date of June 3, 2019. Please indicate your acceptance of this offer by signing below and returning the signed acknowledgement to the attention of Addie Garner at agarner@elapservices.com.  Please let me know if you have any questions or if I can be of assistance in any way.

Sincerely,

Eileen Clark
Sr. VP, Human Resources

Signed and Accepted this _____21ˢᵗ_____ day of ____MAY____ 2019

By: _____
Eric Meyerhoff

CONFIDENTIAL



## Sales Compensation Plan
## Effective October 2018 through December 2019

### Overview

The ELAP/Imagine Sales Compensation Plan (the "Plan") is intended to reward **Eric Meyerhoff** (hereinafter the "Participant") with a highly competitive total cash compensation package upon achievement of the expected level of performance. The plan is also designed to provide exceptional earnings opportunities for outstanding performance without a cap on earnings potential. The purpose of this Agreement is to establish a Plan and other parameters of employment where Participant can be successful and rewarded for his/her efforts in achieving individual sales goals and the Company can gain value from his/her employment.

### Parties

This Agreement is by and between HCOS Services, LLC (hereinafter the "Company"), and Participant.

### Duration

This Plan covers commissions earned through contracts acquired and implemented by December 31, 2019 only. Commissions payments are made monthly following implementation.

### Duties and Responsibilities

Participant is expected to make every effort to optimize his/her sales performance, as well as the sales performance of his/her sales team, and engage in activity on a daily basis that will facilitate this goal. A further description of Participant's duties and responsibilities are attached hereto. Participant's sales territory and/or geographic region of work is described as follows: **Greater New York, Boston and other areas assigned by your Market Leader**

### Sales Compensation

- **Non-recoverable annual draw:**    $175,000 paid bi-weekly, per Company policy and subject to all withholdings and deductions as required by law. Participant acknowledges and agrees that this non-recoverable Draw is an advance against future commissions earned, a loan, which Participant is responsible to pay back to Company by way of earned Commissions. If the actual commissions as set forth below in a given Draw period exceed the Draw amount, the Participant will be paid the difference per the Plan guidelines. If the Participant does not earn commissions that equal or exceed the Draw amount in a given Draw period, nothing is owed to the Company. To the extent that the Participant's non-recoverable Draw has been met at the time of termination of employment, all commissions that exceed the Draw will be paid within thirty (30) days.

1

**CONFIDENTIAL**

- **Standard Commission:**

| | ELAP Max | ELAP / IH Plus | IH w/o ELAP Wrap | Professional | OOA/OON | National Accounts |
|---|---|---|---|---|---|---|
| Estimated PEPM | $90.00 | $83.00 | $45.00 | $15.00 | $7.00 | $21.00 |
| | | | | | | |
| Year 1 Commission (PEPM) | $4.50 | $4.50 | $2.25 | $0.45 | $0.35 | $1.05 |
| Year 2 Commission (PEPM) | $2.70 | $2.70 | $1.35 | $0.27 | $0.21 | $0.63 |
| | $7.20 | $7.20 | $3.60 | $0.72 | $0.56 | $1.68 |
| | 8.0% | 8.7% | 8.0% | 4.8% | 8.0% | 8.0% |

*All rates are subject to review based on actual revenue experience, which may differ by geographical market.*

**Sample Payout**

| | Lives Sold | ELAP Max Commission Rate | ELAP Max Commission | IH w/o ELAP Wrap Commission Rate | IH w/o ELAP Wrap Commission |
|---|---|---|---|---|---|
| Current year sales | 3000 | $4.50 | $13,500 | $2.25 | $6,750 |
| Sales 1 year ago | 1500 | $2.70 | $4,050 | $1.35 | $2,025 |
| **Total monthly commission earned** | | | **$17,750** | | **$8,775** |
| **Total annualized commission earned** | | | **$213,000** | | **$105,300** |

**Sales Goals**

- 2,000 employee lives closed by 1/1/20

**Commission Payment Exceptions**

Conditions that could call for exception or reductions to commission payments are as follows:

- **Contingencies** – Any contingencies that disallow revenue recognition will not be counted until the contingency is released and revenue can be recognized
- **Implementations** – No agreements as to implementation schedules are authorized without the prior consent of the HCOS Executive Management.
- **Discounting** – Any discounts extended to (customers/partners) must be approved by HCOS Executive Management in accordance with Company policy <u>prior to</u> any verbal or written agreement reflecting the discounts.
- **Saved Accounts** – If Participant is re-engaged with an existing at-risk client in an effort to retain that client, and the retention effort results in a renewal, Sales leadership may at its option, treat that renewal as a new sale and pay a single year of commission at the $4.50 PEPM rate.

- **Shared Sale** – If two or more Business Development Directors are instrumental in the close of new business, commission will be paid on an appropriate proportionate basis, as determined by HCOS Executive Management.
- **National Account** - defined as a prospect with greater than 5,000 multi-jurisdictional employees interested in Imagine+ or Imagine Health Plan.

2

- o   Prospect activity from Mercer, WillisTowersWatson, AonHewitt must be coordinated with National Account Team and documented in Salesforce from initial identification
- o   National Accounts will be referred to National Account Sales Team with ongoing participation and commission splits with Regional Salesperson

Ethical violations resulting in no commission and disciplinary action up to and including termination include:

- •   **Side agreements** – Absolutely no side agreements communicating company commitments or promises are allowed. All terms and conditions about a particular sale must be contained in the final agreement and pre-approved by HCOS Executive Management.
- •   **Cash Incentives** – Employees should never be involved in cash incentives to our partners or clients for entering into an agreement for services. **Violation will result in immediate termination**.

In the event that a Participant leaves the employment of Company, either voluntarily or involuntarily, such Participant will be paid for all sales revenues earned for Year 1 under the Plan up to the day of official termination. Year 2 payments under the Plan are not considered earned and therefore not payable upon termination of employment. To the extent that the Participant's non-recoverable Draw has been met at the time of termination of employment, all commissions that exceed the Draw will be paid within thirty (30) days.

## At-Will Employment

The Company reserves the right to terminate Participant at any time if they fail to achieve the performance levels as set forth in this plan. Participant's employment with the Company remains at-will. While the Company has every hope that this employment relationship will be mutually beneficial and rewarding for years to come, both Participant and the Company retain the right to terminate the employment relationship at any time, with or without notice or cause. Nothing in this Compensation Plan shall be interpreted to conflict with or to eliminate or modify in any way Participant's employment-at-will status. The Company reserves the right to modify this Compensation Plan at its sole discretion.

## Confidentiality and Non-Disclosure

Participant agrees that the terms and conditions of the Confidentiality and Non-Disclosure/Non-Solicitation Agreement, which Participant signed as a condition of employment with the Company, remains in full force and effect. This Agreement is attached hereto and incorporated herein.

## Expense Reimbursement

Employee shall be reimbursed for all Company-approved business-related expenses in accordance with the Company's travel and expense reimbursement policy.

## Entirety of Agreement

This Agreement supersedes all other agreements, either oral or written, between the parties to this Agreement, with respect to the obligations contained herein and contains all of the covenants and agreements between the parties with respect to such agreement.

## Governing Law

This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, without regard to its conflict of laws principles. Any disputes under this Agreement shall be brought in the Chester County, Pennsylvania Court of Common Pleas or Federal courts located within the Eastern District of Pennsylvania. Each Party, for itself and its respective Related Parties, hereby consents and submits to the personal jurisdiction and venue of such courts and irrevocably waives any claim of *forum non conveniens* with respect thereto.

**CONFIDENTIAL**

**Other Terms**

- The Company reserves the right to amend, revoke, or modify this Plan at any time. All rates are subject to review based on actual revenue experience, which may differ by geographical market.

- Participant shall comply at all times with all applicable federal, state and local laws, regulations and requirements in the performance of his or her duties.

- Participant shall not engage in any other employment during the term of this agreement. Company reserves the right to require Participant to terminate any such other employment at Company's sole discretion.

- Participant shall use the most ethical practices while engaging in any sales activity.

The undersigned hereby accept the terms on the date indicated below. My signature below certifies my understanding and acceptance of the terms and conditions of the Sales Compensation Plan.

**Employee**

5-21-19
**Date**

**HCOS Services, LLC**

**By:** Eileen Clark

5-21-19
**Date**

4

## CONFIDENTIALITY AGREEMENT

This **Confidentiality Agreement**, is entered into as of __5/21/19__, by and between **HCOS Group LLC, and its affiliates and subsidiaries** (the "Company"), having its principal office at 1550 Liberty Ridge Dr. Ste. 330 Wayne, PA 19087; and __ERIC MEYERHOFF__ ("Employee"), an individual residing __970 Green Pond Rd. Newfoundland, NJ 07435__ at

### WITNESSETH:

**Whereas**, the Company has developed confidential and proprietary systems and processes which are designed to perform services to the benefit of healthcare payers, and their members and beneficiaries;

**Whereas**, the Company's systems and processes are extremely valuable and includes confidential and proprietary information obtained from various sources;

**Whereas**, the Company provides certain medical claims processing, health care cost-containment, consulting and other ministerial services for Employee Health and Welfare Benefit Plans (as defined in the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) (the "Plans" or "Covered Entities"), third-party administrators, and other service providers to healthcare payers;

**Whereas**, the Employee is a member of the Company's workforce, and the Company agrees to disclose certain confidential and proprietary information relating to Company, its clients and business relationships for the purpose of employment with Company ("the Purpose");

**Whereas**, to provide such services to the Plans, both the Company and Employee will have Access to certain confidential and proprietary information, and electronic protected health information ("Electronic Protected Health Information" or "Electronic PHI"), as defined in the Security Standards for the Protection of Electronic Protected Health Information (the "Security Standards") set forth by the U.S. Department of Health and Human Services ("HHS") pursuant to the Health Insurance Portability and Accountability Act of 1996, as amended ("HIPAA");

**Whereas**, the Company is committed to ensuring the protection of confidential and proprietary information and the Security of Electronic PHI and at all times shall comply with the requirements of the Security Standards; and

**Whereas**, the Company believes that it is prudent to require that each of its Employees enter into this Agreement to ensure the protection of the confidential and proprietary information and the Electronic PHI to which the Employees have Access.

**Now, therefore**, as material consideration for my employment or continued employment with, or with any of its affiliated companies (collectively, the "Company") and for the compensation which has been received, or will receive in connection with employment, and in consideration of the mutual covenants and agreements hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

1.   **CONFIDENTIALITY**

1.1      **Confidential Information.** Employee recognizes that the Company now possesses or will possess information of a confidential or secret nature which has commercial value in the business in which the Company is engaged (hereinafter referred to as "Confidential Information"). Confidential Information for this purpose includes but is not limited to trade secrets, business strategies, processes, data, know-how, inventions, improvements, techniques, formulas, marketing plans, product plans, forecasts, discounts, pricing lists, client and customer lists, and other information relating to the purpose, benefits, use and operations of Company, whether belonging to the Company or to any of its customers or suppliers. Employee understands that employment with the Company creates a relationship of trust and confidence between Employee and the Company with respect to the Confidential Information that Employee may learn or develop during the period of employment with the Company.

### A. Company Information

Employee agrees at all times during the term of my employment and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation, without written authorization of Company's CEO, any Confidential Information of the Company.

Employee understands that "Confidential Information" means any information requested and/or received from or on behalf of Company, its affiliated entities or their agents, representatives, subsidiaries, and shall include, without limitation, Company's capabilities; financial information; internal business practices; business plans; business strategies; business processes and procedures; procurement requirements; program and product development; current, past or potential customers, investors, employees, and other business and contractual relationships; business records, including but not limited to, financial information, business forecasts, sales and merchandising, provider information, marketing plans, sales and marketing research; inventions; know how; information technology; databases; technology programs and algorithms; routines; techniques; software source documents; works of authorship, including, without limitation, forms of agreements (whether or not protected by federal copyright law); and other confidential and proprietary information of Company's which are commercially valuable and proprietary or comprise a trade secret, in each case, whether in oral, written, recorded, contained on tape or electronic or other "perceivable" form.

Confidential Information shall also include financial arrangements with business associates and/or business partners, including without limitation, reimbursement rates, payment rates, fee and pricing schedules and methodologies, payment methodologies, negotiation and engagement strategies, and other contractual terms negotiated by Company and/or its agents with clients and medical providers. Confidential Information includes the foregoing types of information obtained from or owned by third parties. Confidential Information includes without limitation, personal information concerning employees or members, medical information including diagnosis, treatment or benefit administration of any member, financial information relating to employees, hospitals, physicians and provider-specific information related to audit proceedings, quality review, malpractice suits and peer-review determinations.

Confidential Information is not limited to documents, but includes any of the aforementioned information, whether tangible or intangible, and shall also include all copies (whether in paper, electronic, digital or other form), excerpts thereof, and all derivations. Derivations shall include, without limitation, using, reviewing, replicating in any way, recreating, modifying, reverse engineering or otherwise reconstructing, decomposing, disassembling, combining with or incorporating in other material, creating or adding to a data base or other compilation, selling, leasing, transferring and creating derivative works.

Employee further understands that Confidential Information does not include any of the foregoing items that have become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved. In the event that it is required by law to disclose any Confidential Information, Employee will give the Company prompt advance written notice thereof and will provide the Company with reasonable assistance, at the sole expense of the Company, in obtaining an order to protect the Confidential Information from public disclosure.

### B. Former Employer Information

Employee agrees that it will not, during employment with Company, improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and that Employee will not bring into the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

### C. Third-Party Information

Employee recognizes that the Company has received and in the future will receive from third-parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Employee agrees to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out work for the Company consistent with the Company's agreement with such third-party.

1.2    **Ownership and Assignment**. Employee agrees that all Confidential Information is the sole property of the Company and its assigns. Employee will promptly disclose all Confidential Information to the Company upon request, and will assign to the Company any rights which may have or which may acquire in any Confidential Information.

1.3    **Obligations Not to Disclose**. At all times, both while employed with the Company and after the termination of my employment with the Company, Employee will keep in strict confidence all Confidential Information and Employee will not use or disclose any Confidential Information or anything relating to it in

whole or in part, nor permit others to use or disclose it in any way, without prior written consent of the Company, except as may be necessary in the ordinary course of performing my duties as an employee of the Company.

      1.4    **Obligations upon Termination of Employment**. Upon termination of employment with the Company for any reason, Employee will promptly deliver to the Company all materials, documents, data, equipment, and other physical property of any nature containing or pertaining to any Confidential Information, and Employee will not take from the Company's premises any such material or equipment or any reproduction thereof.

      1.5    **Notification to New Employer**.  In the event that Employee leaves the employ of Company, and becomes employed by an employer engaged in or which proposes to be engaged in a business competitive with any business which the Company was engaged during the term of employment or in which during the term of employment the Company proposed to enter or become engaged in, Employee hereby grants consent to notification by the Company to Employee's new employer about my rights and obligations under this Agreement.

2.    **COVENANTS**

      2.1    **Non-Competition**. In consideration for and as an inducement to Company to enter into this Agreement, Employee covenants and agrees that during the service and for a period of twelve (12) months following the termination thereof for any reason (the "Non-Compete Period"), Employee shall not, directly or indirectly, anywhere in the Restricted Area, either for Employee or through any other person, have an ownership interest in, manage, participate, operate, control, permit his or her name to be used by, perform services for or otherwise become involved in (whether as an officer, director, manager, employee, investor, partner, proprietor, stockholder, member, trustee, consultant, agent, representative, broker, promoter or otherwise), any Competing Business. Notwithstanding the foregoing, nothing in this section shall prohibit (i) Employee from having a passive ownership interest of not more than one percent (1.0%) of any publicly traded entity whose securities have been registered under the Securities Act of 1933, as amended, or Section 12 of the Securities Exchange Act of 1934, as amended, so long as Employee does not participate in any way in the management, operation or control of such public traded entity; or (ii) from engaging in any activities or performing any services in connection with services with the employer after the Effective Date.  For the purpose of this Agreement, the term (x) "Competing Business" shall mean any business that develops, sells or otherwise provides any services that compete with (A) products or services developed, sold or otherwise provided by Company during the three (3) year period prior to the date of the termination of my service; or (B) products or services specifically planned to be developed, sold or otherwise provided by Company in the future as documented by a written plan or disclosed to myself as Confidential Information within the two (2) year period prior to the date of the termination of my service, and (y) "Restricted Area" shall mean all states, territories (and the District of Columbia, as applicable) in which Company conducted business during the four (4) year period prior to the date of the termination of my service and all states and territories (and the District of Columbia, as applicable) in which Employee called on customers or performed other services for Company during the same period.

      Employee further agrees that the phrase "directly or indirectly compete" shall include owning, managing, operating, or controlling, or participating in the ownership, management, operation, or control of, or being connected with or having any interest in, as a stockholder, director, officer, employee, agent, consultant, assistant, advisor, sole proprietor, partner or otherwise, any business which develops and leases high performance health provider networks that share competitive similarities with the Company's network offering; provided, however, that this prohibition shall not apply to my ownership of less than five percent (5%) of the voting stock in companies whose stock is traded on a national securities exchange or in the over-the-counter market.

      2.2    **Non-Solicitation and Non-Interference.**  During the Restricted Period, Employee will not, directly or indirectly, either for Employee or through any other person or entity, (i) induce or attempt to induce any current or former (within the past twelve (12) month period) employee to leave the employ of Company, or in any way interfere with the relationship between such employee and Company, (ii) hire any current or former employee (within the past twelve (12) month period) of Company or (iii) call on, solicit or service any current Company customer or client or competitive with those Services offered by ELAP during the two (2) year period prior to the date of the termination of service or induce or attempt to induce such person to cease doing or decrease its business with Company, or in any way interfere with the relationship between any customer, vendor, broker, third-party administrator or other business relation and Company (including making any negative statement or communication that is intended to or could reasonably be expected to disparage Company).

      2.3    **Mutual Non-Disparagement.**  Each party will not, in any manner, directly or indirectly, make any oral or written statement to any person that disparages or places the other party in a false or negative light; provided, however, that each party shall not be required to make any untruthful statement or to violate any law. The foregoing will not be violated by truthful non-disparaging statements made by Company or Employee, as applicable, in response to legal process, required governmental testimony or filings, or administrative or arbitral proceedings (including, without limitation, in connection with such proceedings).

      2.4    **Enforceability**. If any of the provisions of this Section 2 is held to be unenforceable, the remaining provisions shall nevertheless remain enforceable, and the court making such determination shall

modify, among other things, the scope, duration, or geographic area of this Section to preserve the enforceability hereof to the maximum extent then permitted by law. In addition, the enforceability of this Section is also subject to the injunctive and other equitable powers of a court.

**Acknowledgment; Enforcement.**

(a)      I acknowledge that I am subject to the obligations set forth above (collectively, the "Restrictive Covenants").

(b)      I understand that the Restrictive Covenants may limit his or her ability to earn a livelihood in a business similar to the business of the Company, but I nevertheless believe that I have received and will receive sufficient consideration and other benefits in connection with my service with the Company and to clearly justify such Restrictive Covenants which, in any event (given my education, skills and ability), I do not believe would prevent myself from otherwise earning a living.  I have carefully considered the nature and extent of the Restrictive Covenants, and hereby acknowledge and agree that the same are reasonable, do not confer a benefit upon the Company disproportionate to the detriment of myself, are reasonable in time, scope and territory and necessary for the protection of the Company.

(c)      Because my services are unique and because I will have access to Confidential Information upon signing this agreement, the parties hereto agree that money damages would be an inadequate remedy for any breach of this Agreement.  Therefore, in the event of a breach or threatened breach of this Agreement or of the Restrictive Covenants, the Company or its successors or assigns may, in addition to other rights and remedies existing in their favor at law or in equity, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce, or prevent any violations of, the provisions hereof (without posting a bond or other security) or require myself to account for and pay over to the Company all compensation, profits, moneys, accruals, increments or other benefits derived from or received as a result of any transactions constituting a breach of the Restrictive Covenants, if and when the final and non-appealable judgment of a court of competent jurisdiction is so entered against myself.  I agree that these covenants are necessary for the protection of Company's legitimate business interests and are reasonable in scope and content.  This Section shall survive the expiration or termination of this Agreement.

(d)      If any Restrictive Covenant is unenforceable with respect to the duration and geographic area of restriction of such Restrictive Covenant, then the duration and geographic area of restriction shall be reduced to the maximum duration and geographic area of restriction deemed legal, valid and enforceable and that come closest to expressing the intention of the parties with respect to the covenant, and the covenant shall be enforceable as so modified.  The parties agree that a court with proper jurisdiction shall be allowed to reduce the Restrictive Covenants to the maximum duration and geographic area of restriction deemed legal, valid and enforceable.

(f)      The forfeiture provisions in this Agreement shall continue to apply, in accordance with their terms, after the provisions of any employment or other agreement between the Company and Employee have lapsed.

(g)      I covenant and agree that I will not seek to challenge the enforceability of the Restrictive Covenants against Company, nor will I assert as a defense to any action seeking enforcement of the Restrictive Covenants (including an action seeking injunctive relief) that such provisions are not enforceable due to lack of sufficient consideration received by myself.

## 3.    WORK PRODUCT/INVENTIONS

3.1      **Disclosure of Work Product**. If Employee conceives, learns, makes, or first reduces to practice, either alone or jointly with others, any inventions, improvements, processes, plans, original works of authorship, formulas, processes, computer programs, techniques, innovations, technical information, systems, software developments, methods, designs, analyses, drawings, formal opinions and memos, reports, service marks, trademarks, trade names, trade dress, logos and all similar or related information (whether patentable or unpatentable) which relates to the actual or anticipated business, operations, research and development or existing or future products or services of Company and which are conceived, developed or made by myself (whether or not during usual business hours and whether or not alone or in conjunction with any other person) during the period of my service together with all patent applications, letters patent, trademark, trade name and service mark applications or registrations, copyrights and reissues thereof that may be granted for or upon any of the foregoing, know-how, or data in any way related to or useful in the Company's business (hereinafter referred to as "Work Product") while employed by the Company, Employee will promptly disclose such Work Product to the Company or to any person designated by it. Employee recognizes and agrees that the Work Product, to the extent copyrightable, constitutes works for hire under the copyright laws of the United States.

3.2      **Ownership, Assignment, Assistance, and Power of Attorney**. All Work Product which the

Company determines in its sole discretion to be related to or useful in the Company's business or in the research and development of the Company's business or which result from work performed by Employee for the Company shall be the sole and exclusive property of the Company, and the Company shall have the right to use and to apply for patents, copyrights, or other statutory or common law protections for such Inventions in any country. Employee hereby assigns to the Company any rights which have been acquired or which may be acquired in such Work Product. Furthermore, Employee will assist the Company in every proper way at the Company's expense to obtain patents, copyrights, and other statutory or common law protections for such Inventions in any country and to enforce such rights from time to time. Specifically, Employee will execute all documents as the Company may use in applying for and in obtaining or enforcing such patents, copyrights, and other statutory or common law protections, together with any assignments thereof to the Company or to any person designated by the Company. Employee's obligations under this paragraph shall continue beyond the termination of employment with the Company, but the Company shall compensate me at a reasonable rate after such termination for the time which Employee actually spends at the Company's request in rendering such assistance. In the event the Company is unable for any reason whatsoever to secure Employee's signature to any lawful document required to apply for or to enforce any patent, copyright, or other statutory or common law protections for such Work Product, Employee hereby irrevocably and severally designate and appoint the Company and its duly authorized officers and agents as Employee's agents and attorneys-in-fact to act in Employee's stead to execute such documents and to do such other lawful and necessary acts to further the issuance or prosecution of such patents, copyrights, and other statutory or common law protections, and Employee hereby declares that such documents or such acts shall have the same legal force and effect as if such documents were executed by Employee or such acts were done by Employee.

   3.3 **Exclusion of Prior Work Product**. Employee has identified on **Exhibit A** attached hereto a complete list of all Work Product which Employee has conceived, learned, made or first reduced to practice, either alone or jointly with others, prior to my employment with the Company relating to or useful in the operation of the Company's business which Employee desires to exclude from the restrictions of this Agreement. If no Work Product is listed on **Exhibit A**, Employee represent that he/she has made no such Work Product at the time of signing this Agreement.

4. **CONFLICTS**

   4.1 **Prior Agreement and Conflicting Employment**. Employee represents that, to the best of his/her knowledge, Employee's performance of all the terms of this Agreement and work as an employee of the Company does not breach any oral or written agreement which Employee has made to keep in confidence proprietary information acquired prior to employment with the Company. Employee agrees that, during the term of my employment with Company, Employee will not engage in any other employment, occupation, consulting or other business activity related to the business in which the Company is now involved or becomes involved during the term of employment, nor will he/she engage in any other activities that conflict with my obligations to the Company.

   4.2 **Materials of Prior Employers**. Employee represents that he/she has not used nor will he/she use in the performance of the duties for the Company any materials or documents of a former employer which are not generally available to the public, unless Employee has first obtained written authorization form the former employer for their possession and use and have delivered a copy of such written authorization to the Company before use of such materials or documents in connection with the performance of the duties for the Company.

   4.3 **Other Agreements**. While Employee is employed by the Company, Employee will not enter into any oral or written agreement which conflicts with obligations under this Agreement or with the performance of work as an employee of the Company.

5.  **PHI Duties and Obligations of the Employee**

   5.1. **Electronic PHI Removed from Company's Premises.** Any Employee who works at his or her home shall remove from the Company's premises only the minimum necessary amount of Electronic PHI that is specifically needed for the Employee to perform his or her job duties and shall place such Electronic PHI only at his or her home. The Electronic PHI shall be returned to the Company's premises as soon as it is no longer needed by the Employee to perform his or her job duties.

   5.2. **Safeguarding Electronic PHI.** Any Electronic PHI stored on a computer at an Employee's home shall be protected by a Password known only to the Employee, and any Electronic Media maintained at the Employee's home, excepting only Employee's computer hard drive, shall be stored in a locked area to which only the Employee has access. The Employee shall take all Security Measures necessary to ensure that no one other than the Employee is able to view a monitor on which Electronic PHI is displayed (through limiting access of individuals to the room in which the Employee works and turning off the computer each time the Employee leaves the Workstation) and that such Electronic PHI is backed up on a daily basis. In the event the Employee disposes of a hard drive containing Electronic PHI, he or she shall ensure that it is cleared of all Electronic PHI prior to disposal. Further, the Employee shall ensure that any connection to the Company's Information Systems is secure.

   5.3. **Compliance. Employee** agrees to fully comply with all applicable federal, state and local laws, statutes, regulations and ordinances, including, but not limited to the requirements of HIPAA and its

implementing regulations (45 C.F.R. Parts 160-64) and the requirements of the Health Information Technology for Economic and Clinical Health Act, as incorporates in the American Recovery and Reinvestment Act of 2009 (the "HITECH Act").

5.4. **Email Transmissions.** In the event Electronic PHI is sent or received by email at the Employee's home, the Employee shall ensure that no one has Access to such email and that the email transmissions are Confidential.

5.5. **Other Policies.** The Employee shall comply with all other policies and procedures of the Company relating to Electronic PHI and other workplace rules.

6. **Term and Termination.**

6.1. **Term.** The term of this Agreement shall be effective as of the date set forth above in the first paragraph and shall terminate when all of the Electronic PHI provided by a Covered Entity or the Company to the Employee, or created or received by the Employee on behalf of a Covered Entity or the Company, is destroyed or returned to the Company.

6.2. **Effect of Termination.** Upon termination of this Agreement, for any reason, the Employee shall return or destroy all Electronic PHI received from a Covered Entity or the Company, or created or received by the Employee on behalf of a Covered Entity or the Company. The Employee shall retain no copies of Electronic PHI. Upon one (1) week's prior written notice from the Company, the Employee shall permit representatives of the Company to enter his or her home and inspect any Workstation and computer to verify that no Electronic PHI remains at the Employee's home.

7. **MISCELLANEOUS**

7.1 **No Obligation to Employ.** This Agreement does not constitute a contract of employment nor does it create an implied obligation of the Company to employ me for any certain period of time. Employee acknowledges that he/she is an at-will employee and that he/she can leave the Company at any time and the Company can terminate his/her employment at any time for any reason.

7.2 **Entire Agreement; Modification.** Along with the Internet Policy, this Agreement constitutes the entire agreement between the Company and me with respect to the subject matters covered by it and supersedes all prior oral or written agreements between the Company and me relating to such matters. No provision of this Agreement may be modified, except in writing, signed by the parties, and except to comply with the requirements of the Security Standards and HIPAA.

7.3 **No Third Party Beneficiaries.** There shall be no third party beneficiaries to this Agreement, and no individual (including an "Individual" as defined in 45 C.F.R. § 160.103 or entity who is not a party to this Agreement shall have any rights in connection with a breach or violation of this Agreement.

7.4 **Binding Effect.** This Agreement shall be binding upon the parties hereto and their successors and assigns heirs, executors, administrators and other legal representatives and will inure to the benefit of the Company, its successors, and assigns.

7.5 **Severability.** If any provision of this Agreement is held by a court of competent jurisdiction to be void or unenforceable for any reason, the remaining provisions of this Agreement shall nevertheless continue in full force and effect.

7.6 **Governing Law; Consent to Personal Jurisdiction; Waiver of Jury Trial.** This Agreement will be governed by the laws of the Commonwealth of Pennsylvania. Employee hereby expressly consents to the personal jurisdiction of the state and federal courts located in Pennsylvania for the resolution of any and all disputes arising from or relating to this Agreement. **If any dispute between the parties arises which results in litigation, the parties agree to waive any right that the party may have to a trial by jury and agree that the dispute will be determined solely by a judge.**

7.8 **Effective Date.** This Agreement will be effective as of the date set forth on the signature page hereof.

**IN WITNESS WHEREOF,** the parties have executed this document, intending to be legally bound, as of the date set forth below.

Dated: _____5/21/19_____

HCOS GROUP, LLC

By: _____

Name: _____

Title: _____

**EMPLOYEE**

By: _____

Name (Print): _____ ERIC MEYERHUFF

EXHIBIT  B

## CONFIDENTIALITY AGREEMENT

This **Confidentiality Agreement**, is entered into as of _5/21/19_ , by and between **HCOS Group LLC, and its affiliates and subsidiaries** (the "Company"), having its principal office at 1550 Liberty Ridge Dr. Ste. 330 Wayne, PA  19087; and _ERIC MEYERHOFF_ ("Employee"), an individual residing _970 Green Pond Rd. Newfoundland, NJ  07435_ at

### WITNESSETH:

**Whereas**, the Company has developed confidential and proprietary systems and processes which are designed to perform services to the benefit of healthcare payers, and their members and beneficiaries;

**Whereas**, the Company's systems and processes are extremely valuable and includes confidential and proprietary information obtained from various sources;

**Whereas**, the Company provides certain medical claims processing, health care cost-containment, consulting and other ministerial services for Employee Health and Welfare Benefit Plans (as defined in the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) (the "Plans" or "Covered Entities"), third-party administrators, and other service providers to healthcare payers;

**Whereas**, the Employee is a member of the Company's workforce, and the Company agrees to disclose certain confidential and proprietary information relating to Company, its clients and business relationships for the purpose of employment with Company ("the Purpose");

**Whereas**, to provide such services to the Plans, both the Company and Employee will have Access to certain confidential and proprietary information, and electronic protected health information ("Electronic Protected Health Information" or "Electronic PHI"), as defined in the Security Standards for the Protection of Electronic Protected Health Information (the "Security Standards") set forth by the U.S. Department of Health and Human Services ("HHS") pursuant to the Health Insurance Portability and Accountability Act of 1996, as amended ("HIPAA");

**Whereas**, the Company is committed to ensuring the protection of confidential and proprietary information and the Security of Electronic PHI and at all times shall comply with the requirements of the Security Standards; and

**Whereas**, the Company believes that it is prudent to require that each of its Employees enter into this Agreement to ensure the protection of the confidential and proprietary information and the Electronic PHI to which the Employees have Access.

**Now, therefore**, as material consideration for my employment or continued employment with, or with any of its affiliated companies (collectively, the "Company") and for the compensation which has been received, or will receive in connection with employment, and in consideration of the mutual covenants and agreements hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

1.    **CONFIDENTIALITY**

1.1    **Confidential Information**. Employee recognizes that the Company now possesses or will possess information of a confidential or secret nature which has commercial value in the business in which the Company is engaged (hereinafter referred to as "Confidential Information"). Confidential Information for this purpose includes but is not limited to trade secrets, business strategies, processes, data, know-how, inventions, improvements, techniques, formulas, marketing plans, product plans, forecasts, discounts, pricing lists, client and customer lists, and other information relating to the purpose, benefits, use and operations of Company, whether belonging to the Company or to any of its customers or suppliers. Employee understands that employment with the Company creates a relationship of trust and confidence between Employee and the Company with respect to the Confidential Information that Employee may learn or develop during the period of employment with the Company.

### A. Company Information

Employee agrees at all times during the term of my employment and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation, without written authorization of Company's CEO, any Confidential Information of the Company.

Employee understands that "Confidential Information" means any information requested and/or received from or on behalf of Company, its affiliated entities or their agents, representatives, subsidiaries, and shall include, without limitation, Company's capabilities; financial information; internal business practices; business plans; business strategies; business processes and procedures; procurement requirements; program and product development; current, past or potential customers, investors, employees, and other business and contractual relationships; business records, including but not limited to, financial information, business forecasts, sales and merchandising, provider information, marketing plans, sales and marketing research; inventions; know how; information technology; databases; technology programs and algorithms; routines; techniques; software source documents; works of authorship, including, without limitation, forms of agreements (whether or not protected by federal copyright law); and other confidential and proprietary information of Company's which are commercially valuable and proprietary or comprise a trade secret, in each case, whether in oral, written, recorded, contained on tape or electronic or other "perceivable" form.

Confidential Information shall also include financial arrangements with business associates and/or business partners, including without limitation, reimbursement rates, payment rates, fee and pricing schedules and methodologies, payment methodologies, negotiation and engagement strategies, and other contractual terms negotiated by Company and/or its agents with clients and medical providers.  Confidential Information includes the foregoing types of information obtained from or owned by third parties.  Confidential Information includes without limitation, personal information concerning employees or members, medical information including diagnosis, treatment or benefit administration of any member, financial information relating to employees, hospitals, physicians and provider-specific information related to audit proceedings, quality review, malpractice suits and peer-review determinations.

Confidential Information is not limited to documents, but includes any of the aforementioned information, whether tangible or intangible, and shall also include all copies (whether in paper, electronic, digital or other form), excerpts thereof, and all derivations.  Derivations shall include, without limitation, using, reviewing, replicating in any way, recreating, modifying, reverse engineering or otherwise reconstructing, decomposing, disassembling, combining with or incorporating in other material, creating or adding to a data base or other compilation, selling, leasing, transferring and creating derivative works.

Employee further understands that Confidential Information does not include any of the foregoing items that have become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved.  In the event that it is required by law to disclose any Confidential Information, Employee will give the Company prompt advance written notice thereof and will provide the Company with reasonable assistance, at the sole expense of the Company, in obtaining an order to protect the Confidential Information from public disclosure.

### B. Former Employer Information

Employee agrees that it will not, during employment with Company, improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and that Employee will not bring into the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

### C. Third-Party Information

Employee recognizes that the Company has received and in the future will receive from third-parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes.  Employee agrees to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out work for the Company consistent with the Company's agreement with such third-party.

   1.2    **Ownership and Assignment**. Employee agrees that all Confidential Information is the sole property of the Company and its assigns. Employee will promptly disclose all Confidential Information to the Company upon request, and will assign to the Company any rights which may have or which may acquire in any Confidential Information.

   1.3    **Obligations Not to Disclose**. At all times, both while employed with the Company and after the termination of my employment with the Company, Employee will keep in strict confidence all Confidential Information and Employee will not use or disclose any Confidential Information or anything relating to it in

whole or in part, nor permit others to use or disclose it in any way, without prior written consent of the Company, except as may be necessary in the ordinary course of performing my duties as an employee of the Company.

1.4     **Obligations upon Termination of Employment.** Upon termination of employment with the Company for any reason, Employee will promptly deliver to the Company all materials, documents, data, equipment, and other physical property of any nature containing or pertaining to any Confidential Information, and Employee will not take from the Company's premises any such material or equipment or any reproduction thereof.

1.5     **Notification to New Employer.** In the event that Employee leaves the employ of Company, and becomes employed by an employer engaged in or which proposes to be engaged in a business competitive with any business which the Company was engaged during the term of employment or in which during the term of employment the Company proposed to enter or become engaged in, Employee hereby grants consent to notification by the Company to Employee's new employer about my rights and obligations under this Agreement.

2.     **COVENANTS**

2.1     **Non-Competition.** In consideration for and as an inducement to Company to enter into this Agreement, Employee covenants and agrees that during the service and for a period of twelve (12) months following the termination thereof for any reason (the "Non-Compete Period"), Employee shall not, directly or indirectly, anywhere in the Restricted Area, either for Employee or through any other person, have an ownership interest in, manage, participate, operate, control, permit his or her name to be used by, perform services for or otherwise become involved in (whether as an officer, director, manager, employee, investor, partner, proprietor, stockholder, member, trustee, consultant, agent, representative, broker, promoter or otherwise), any Competing Business. Notwithstanding the foregoing, nothing in this section shall prohibit (i) Employee from having a passive ownership interest of not more than one percent (1.0%) of any publicly traded entity whose securities have been registered under the Securities Act of 1933, as amended, or Section 12 of the Securities Exchange Act of 1934, as amended, so long as Employee does not participate in any way in the management, operation or control of such public traded entity; or (ii) from engaging in any activities or performing any services in connection with services with the employer after the Effective Date. For the purpose of this Agreement, the term (x) "Competing Business" shall mean any business that develops, sells or otherwise provides any services that compete with (A) products or services developed, sold or otherwise provided by Company during the three (3) year period prior to the date of the termination of my service; or (B) products or services specifically planned to be developed, sold or otherwise provided by Company in the future as documented by a written plan or disclosed to myself as Confidential Information within the two (2) year period prior to the date of the termination of my service, and (y) "Restricted Area" shall mean all states, territories (and the District of Columbia, as applicable) in which Company conducted business during the four (4) year period prior to the date of the termination of my service and all states and territories (and the District of Columbia, as applicable) in which Employee called on customers or performed other services for Company during the same period.

Employee further agrees that the phrase "directly or indirectly compete" shall include owning, managing, operating, or controlling, or participating in the ownership, management, operation, or control of, or being connected with or having any interest in, as a stockholder, director, officer, employee, agent, consultant, assistant, advisor, sole proprietor, partner or otherwise, any business which develops and leases high performance health provider networks that share competitive similarities with the Company's network offering; provided, however, that this prohibition shall not apply to my ownership of less than five percent (5%) of the voting stock in companies whose stock is traded on a national securities exchange or in the over-the-counter market.

2.2     **Non-Solicitation and Non-Interference.** During the Restricted Period, Employee will not, directly or indirectly, either for Employee or through any other person or entity, (i) induce or attempt to induce any current or former (within the past twelve (12) month period) employee to leave the employ of Company, or in any way interfere with the relationship between such employee and Company, (ii) hire any current or former employee (within the past twelve (12) month period) of Company or (iii) call on, solicit or service any current Company customer or client or competitive with those Services offered by ELAP during the two (2) year period prior to the date of the termination of service or induce or attempt to induce such person to cease doing or decrease its business with Company, or in any way interfere with the relationship between any customer, vendor, broker, third-party administrator or other business relation and Company (including making any negative statement or communication that is intended to or could reasonably be expected to disparage Company).

2.3     **Mutual Non-Disparagement.** Each party will not, in any manner, directly or indirectly, make any oral or written statement to any person that disparages or places the other party in a false or negative light; provided, however, that each party shall not be required to make any untruthful statement or to violate any law. The foregoing will not be violated by truthful non-disparaging statements made by Company or Employee, as applicable, in response to legal process, required governmental testimony or filings, or administrative or arbitral proceedings (including, without limitation, in connection with such proceedings).

2.4     **Enforceability.** If any of the provisions of this Section 2 is held to be unenforceable, the remaining provisions shall nevertheless remain enforceable, and the court making such determination shall

modify, among other things, the scope, duration, or geographic area of this Section to preserve the enforceability hereof to the maximum extent then permitted by law. In addition, the enforceability of this Section is also subject to the injunctive and other equitable powers of a court.

**Acknowledgment; Enforcement.**

(a)     I acknowledge that I am subject to the obligations set forth above (collectively, the "Restrictive Covenants").

(b)     I understand that the Restrictive Covenants may limit his or her ability to earn a livelihood in a business similar to the business of the Company, but I nevertheless believe that I have received and will receive sufficient consideration and other benefits in connection with my service with the Company and to clearly justify such Restrictive Covenants which, in any event (given my education, skills and ability), I do not believe would prevent myself from otherwise earning a living.  I have carefully considered the nature and extent of the Restrictive Covenants, and hereby acknowledge and agree that the same are reasonable, do not confer a benefit upon the Company disproportionate to the detriment of myself, are reasonable in time, scope and territory and necessary for the protection of the Company.

(c)     Because my services are unique and because I will have access to Confidential Information upon signing this agreement, the parties hereto agree that money damages would be an inadequate remedy for any breach of this Agreement.  Therefore, in the event of a breach or threatened breach of this Agreement or of the Restrictive Covenants, the Company or its successors or assigns may, in addition to other rights and remedies existing in their favor at law or in equity, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce, or prevent any violations of, the provisions hereof (without posting a bond or other security) or require myself to account for and pay over to the Company all compensation, profits, moneys, accruals, increments or other benefits derived from or received as a result of any transactions constituting a breach of the Restrictive Covenants, if and when the final and non-appealable judgment of a court of competent jurisdiction is so entered against myself.  I agree that these covenants are necessary for the protection of Company's legitimate business interests and are reasonable in scope and content.  This Section shall survive the expiration or termination of this Agreement.

(d)     If any Restrictive Covenant is unenforceable with respect to the duration and geographic area of restriction of such Restrictive Covenant, then the duration and geographic area of restriction shall be reduced to the maximum duration and geographic area of restriction deemed legal, valid and enforceable and that come closest to expressing the intention of the parties with respect to the covenant, and the covenant shall be enforceable as so modified.  The parties agree that a court with proper jurisdiction shall be allowed to reduce the Restrictive Covenants to the maximum duration and geographic area of restriction deemed legal, valid and enforceable.

(f)     The forfeiture provisions in this Agreement shall continue to apply, in accordance with their terms, after the provisions of any employment or other agreement between the Company and Employee have lapsed.

(g)     I covenant and agree that I will not seek to challenge the enforceability of the Restrictive Covenants against Company, nor will I assert as a defense to any action seeking enforcement of the Restrictive Covenants (including an action seeking injunctive relief) that such provisions are not enforceable due to lack of sufficient consideration received by myself.

3.     **WORK PRODUCT/INVENTIONS**

3.1     **Disclosure of Work Product**. If Employee conceives, learns, makes, or first reduces to practice, either alone or jointly with others, any inventions, improvements, processes, plans, original works of authorship, formulas, processes, computer programs, techniques, innovations, technical information, systems, software developments, methods, designs, analyses, drawings, formal opinions and memos, reports, service marks, trademarks, trade names, trade dress, logos and all similar or related information (whether patentable or unpatentable) which relates to the actual or anticipated business, operations, research and development or existing or future products or services of Company and which are conceived, developed or made by myself (whether or not during usual business hours and whether or not alone or in conjunction with any other person) during the period of my service together with all patent applications, letters patent, trademark, trade name and service mark applications or registrations, copyrights and reissues thereof that may be granted for or upon any of the foregoing, know-how, or data in any way related to or useful in the Company's business (hereinafter referred to as "Work Product") while employed by the Company, Employee will promptly disclose such Work Product to the Company or to any person designated by it. Employee recognizes and agrees that the Work Product, to the extent copyrightable, constitutes works for hire under the copyright laws of the United States.

3.2     **Ownership, Assignment, Assistance, and Power of Attorney**. All Work Product which the

Company determines in its sole discretion to be related to or useful in the research and development of the Company's business or which result from work performed by Employee for the Company shall be the sole and exclusive property of the Company, and the Company shall have the right to use and to apply for patents, copyrights, or other statutory or common law protections for such Inventions in any country. Employee hereby assigns to the Company any rights which have been acquired or which may be acquired in such Work Product. Furthermore, Employee will assist the Company in every proper way at the Company's expense to obtain patents, copyrights, and other statutory or common law protections for such Inventions in any country and to enforce such rights from time to time. Specifically, Employee will execute all documents as the Company may use in applying for and in obtaining or enforcing such patents, copyrights, and other statutory or common law protections, together with any assignments thereof to the Company or to any person designated by the Company. Employee's obligations under this paragraph shall continue beyond the termination of employment with the Company, but the Company shall compensate me at a reasonable rate after such termination for the time which Employee actually spends at the Company's request in rendering such assistance. In the event the Company is unable for any reason whatsoever to secure Employee's signature to any lawful document required to apply for or to enforce any patent, copyright, or other statutory or common law protections for such Work Product, Employee hereby irrevocably and severally designate and appoint the Company and its duly authorized officers and agents as Employee's agents and attorneys-in-fact to act in Employee's stead to execute such documents and to do such other lawful and necessary acts to further the issuance or prosecution of such patents, copyrights, and other statutory or common law protections, and Employee hereby declares that such documents or such acts shall have the same legal force and effect as if such documents were executed by Employee or such acts were done by Employee.

3.3     **Exclusion of Prior Work Product**. Employee has identified on **Exhibit A** attached hereto a complete list of all Work Product which Employee has conceived, learned, made or first reduced to practice, either alone or jointly with others, prior to my employment with the Company relating to or useful in the operation of the Company's business which Employee desires to exclude from the restrictions of this Agreement. If no Work Product is listed on **Exhibit A**, Employee represent that he/she has made no such Work Product at the time of signing this Agreement.

4.     **CONFLICTS**

4.1     **Prior Agreement and Conflicting Employment**. Employee represents that, to the best of his/her knowledge, Employee's performance of all the terms of this Agreement and work as an employee of the Company does not breach any oral or written agreement which Employee has made to keep in confidence proprietary information acquired prior to employment with the Company. Employee agrees that, during the term of my employment with Company, Employee will not engage in any other employment, occupation, consulting or other business activity related to the business in which the Company is now involved or becomes involved during the term of employment, nor will he/she engage in any other activities that conflict with my obligations to the Company.

4.2     **Materials of Prior Employers**.  Employee represents that he/she has not used nor will he/she use in the performance of the duties for the Company any materials or documents of a former employer which are not generally available to the public, unless Employee has first obtained written authorization form the former employer for their possession and use and have delivered a copy of such written authorization to the Company before use of such materials or documents in connection with the performance of the duties for the Company.

4.3     **Other Agreements**. While Employee is employed by the Company, Employee will not enter into any oral or written agreement which conflicts with obligations under this Agreement or with the performance of work as an employee of the Company.

5.     **PHI Duties and Obligations of the Employee**

5.1.     **Electronic PHI Removed from Company's Premises.** Any Employee who works at his or her home shall remove from the Company's premises only the minimum necessary amount of Electronic PHI that is specifically needed for the Employee to perform his or her job duties and shall place such Electronic PHI only at his or her home.  The Electronic PHI shall be returned to the Company's premises as soon as it is no longer needed by the Employee to perform his or her job duties.

5.2.     **Safeguarding Electronic PHI.** Any Electronic PHI stored on a computer at an Employee's home shall be protected by a Password known only to the Employee, and any Electronic Media maintained at the Employee's home, excepting only Employee's computer hard drive, shall be stored in a locked area to which only the Employee has access.  The Employee shall take all Security Measures necessary to ensure that no one other than the Employee is able to view a monitor on which Electronic PHI is displayed (through limiting access of individuals to the room in which the Employee works and turning off the computer each time the Employee leaves the Workstation) and that such Electronic PHI is backed up on a daily basis.  In the event the Employee disposes of a hard drive containing Electronic PHI, he or she shall ensure that it is cleared of all Electronic PHI prior to disposal.  Further, the Employee shall ensure that any connection to the Company's Information Systems is secure.

5.3.     **Compliance.** Employee agrees to fully comply with all applicable federal, state and local laws, statutes, regulations and ordinances, including, but not limited to the requirements of HIPAA and its

implementing regulations (45 C.F.R. Parts 160-64) and the requirements of the Health Information Technology for Economic and Clinical Health Act, as incorporates in the American Recovery and Reinvestment Act of 2009 (the "HITECH Act").

5.4.    **Email Transmissions.**  In the event Electronic PHI is sent or received by email at the Employee's home, the Employee shall ensure that no one has Access to such email and that the email transmissions are Confidential.

5.5.    **Other Policies.**  The Employee shall comply with all other policies and procedures of the Company relating to Electronic PHI and other workplace rules.

## 6.    Term and Termination.

6.1.    **Term.**  The term of this Agreement shall be effective as of the date set forth above in the first paragraph and shall terminate when all of the Electronic PHI provided by a Covered Entity or the Company to the Employee, or created or received by the Employee on behalf of a Covered Entity or the Company, is destroyed or returned to the Company.

6.2.    **Effect of Termination.**  Upon termination of this Agreement, for any reason, the Employee shall return or destroy all Electronic PHI received from a Covered Entity or the Company, or created or received by the Employee on behalf of a Covered Entity or the Company.  The Employee shall retain no copies of Electronic PHI.  Upon one (1) week's prior written notice from the Company, the Employee shall permit representatives of the Company to enter his or her home and inspect any Workstation and computer to verify that no Electronic PHI remains at the Employee's home.

## 7.    MISCELLANEOUS

7.1    **No Obligation to Employ**. This Agreement does not constitute a contract of employment nor does it create an implied obligation of the Company to employ me for any certain period of time. Employee acknowledges that he/she is an at-will employee and that he/she can leave the Company at any time and the Company can terminate his/her employment at any time for any reason.

7.2    **Entire Agreement; Modification.**  Along with the Internet Policy, this Agreement constitutes the entire agreement between the Company and me with respect to the subject matters covered by it and supersedes all prior oral or written agreements between the Company and me relating to such matters. No provision of this Agreement may be modified, except in writing, signed by the parties, and except to comply with the requirements of the Security Standards and HIPAA.

7.3    **No Third Party Beneficiaries.**  There shall be no third party beneficiaries to this Agreement, and no individual (including an "Individual" as defined in 45 C.F.R. § 160.103 or entity who is not a party to this Agreement shall have any rights in connection with a breach or violation of this Agreement.

7.4    **Binding Effect.**  This Agreement shall be binding upon the parties hereto and their successors and assigns heirs, executors, administrators and other legal representatives and will inure to the benefit of the Company, its successors, and assigns.

7.5    **Severability**.  If any provision of this Agreement is held  by  a court of competent jurisdiction to be void or unenforceable for any reason, the remaining provisions of this Agreement shall nevertheless continue in full force and effect.

7.6    **Governing Law; Consent to Personal Jurisdiction; Waiver of Jury Trial.**  This Agreement will be governed by the laws of the Commonwealth of Pennsylvania.  Employee hereby expressly consents to the personal jurisdiction of the state and federal courts located in Pennsylvania for the resolution of any and all disputes arising from or relating to this Agreement.  **If any dispute between the parties arises which results in litigation, the parties agree to waive any right that the party may have to a trial by jury and agree that the dispute will be determined solely by a judge.**

7.8    **Effective Date.** This Agreement will be effective as of the date set forth on the signature page hereof.

**IN WITNESS WHEREOF,** the parties have executed this document, intending to be legally bound, as of the date set forth below.

Dated: _____5/21/19_____

HCOS GROUP, LLC

By: _____

Name: _____

Title: _____

EMPLOYEE

By: _____

Name (Print): _____ERIC MEYERHOFF_____

EXHIBIT  C

**ClaimDOC**
*Fair Payment Solutions for Health Plans*

📞 1 (800) 330-7295    📍 506 Third Street Des Moines, IA 50309

November 27, 2020

HCOS Group, LLC
*Delivered via email to Troy Sisum at tsisum@elapservices.com*

Re:  Eric Meyerhoff

Dear Mr. Sisum:

Please accept this letter as a courtesy notice of ClaimDOC's recent hiring of former ELAP Services employee, Eric Meyerhoff, effective December 1, 2020.  HCOS requests its employees enter into an agreement that includes, in pertinent part, restrictive covenants prohibiting employment with competitors for one-year from the separation date ("Noncompete").  Although we have a good faith intention to comply with the Noncompete with Meyerhoff, this compliance will only be to the extent the prohibitions are enforceable.  The Noncompete has clear issues with its language; specifically--at a minimum—the geographic scope.  The "Restricted Area" covers all locations in which HCOS and its affiliates do business, defined as "all states, territories (and the District of Columbia, as applicable)." In doing so, the language attempts to block employment with a competitor in areas in which Meyerhoff was specifically precluded from soliciting business during his employ with HCOS.

Pennsylvania case law provides that post-employment restrictions be reasonably necessary for the protection of the employer, and the restrictions be reasonably limited in duration and geographic extent.  HCOS's attempts to prohibit employment with a competitor in locations outside his permitted territory with HCOS does not provide a reasonable scope, does not protect a legitimate interest of HCOS, and would undoubtedly be struck down.  At best, a Pennsylvania court may prohibit Meyerhoff from competing in the region in which he was permitted to solicit business for HCOS for the one-year period.

Accordingly, ClaimDOC will be prohibiting Meyerhoff from soliciting business for ClaimDOC in the area HCOS permitted him to sell for one year from his separation date.  HCOS limited Meyerhoff's territory to the region of North Jersey to Maine, excluding the State of New York.  The southern border of his northern Jersey territory is in line with Princeton, New Jersey.  ClaimDOC has advised Meyerhoff he is required to comply with all other terms of his Noncompete, to the extent enforceable.  He has represented that he has not maintained any confidential or proprietary information of HCOS and understands that ClaimDOC prohibits the use of any protected information of this nature in his employment with ClaimDOC.  We further note that the Omar Arif did not participate in the hiring of Meyerhoff.

We assume these limitations placed on Meyerhoff by ClaimDOC are agreeable by HCOS as they reflect the most restrictive restraints that would be upheld by the court to protect any valid interest of HCOS.  Please contact the undersigned with any further questions or concerns.

Best,

Amy Pellegrin, J.D. | Senior Vice President & Chief Legal Officer

claim-doc.com

# EXHIBIT  D



**Healthcare Cost Optimized Solutions**

1550 Liberty Ridge Drive, Suite 100
Wayne, PA 19087 | (610) 321-1030

November 30, 2020

*Via email to ericimeyerhoff@gmail.com and*
*First-class mail*

Eric Meyerhoff
970 Green Pond Road
New Foundland, NJ 07435

Re: Termination Letter and Non-Compete Agreement

Dear Eric:

This letter confirms our receipt of your email to Will Buckley and Eileen Clark on Friday, November 27th where you resigned from HCOS Group, LLC/ELAP Services, LLC effective immediately.

As you know, on July 14, 2020, you signed an Amendment to the ELAP Sales Compensation Plan, where ELAP agreed to loan you twenty-four thousand ($24,000.00) dollars to be repaid by you. As of November 27, 2020, $0 has been repaid toward this loan, and the outstanding balance is $24,000. Since your employment terminated prior to the full repayment of the loan, the outstanding balance is now due and payable in full. Please send the undersigned $24,000 within the next fourteen (14) days. Attached is a copy of the Amendment, as well as a copy of your executed Sales Compensation Plan for your records. ELAP reserves the right to withhold unpaid wages or expense reimbursements, if any, from this outstanding loan to the fullest extent permitted by law.

By separate letter, Human Resources will send you a letter advising of the status of your employee benefits. They will also coordinate with you the return of any keys, charge cards, and other Company-owned equipment and property.

Attached is a copy of the Confidentiality Agreement that you signed on May 21, 2019, as a condition of your employment. Specifically, as you know, you agreed to a **12-month Non-Competition** period precluding you from managing, participating, operating, performing services, or otherwise becoming involved in a business that competes with HCOS Group, LLC, including affiliated companies ImagineHealth, LLC and ELAP Services, LLC (collectively, "HCOS"). **ClaimDOC is a direct competitor of ELAP Services, LLC.** Please confirm whether it is in fact your intention to be employed ClaimDOC.

As you know, you also agreed in the Confidentiality Agreement to specific requirements regarding the confidentiality of HCOS's business information, the non-interference and/or non-solicitation regarding HCOS employees, brokers, clients, prospects, third party administrators and trading partners, and a non-disparagement clause. Please let us know if you have taken any data or information concerning HCOS's business from HCOS.

You are hereby directed to preserve all data and information in your possession, custody, or control that has anything to do with HCOS, any of its business, employees, offerings, TPAs, brokers, or customers, and/or ClaimDOC and any work you have done or may do for ClaimDOC (if any). Such data and information will be important in any litigation that may arise out of any work you choose to do for ClaimDOC, among other things.

As set forth above, please respond to this letter promptly, but no later than two days from the date of this letter, confirming whether you in fact intend to be employed by ClaimDOC and informing us as to what information, if any, that you have taken from HCOS. Thank you for your attention to this important matter.

Sincerely,

**HCOS Group, LLC**

By: _____
    Troy Sisum
    SVP, Chief Counsel

# EXHIBIT  E



**Fox Rothschild** LLP
ATTORNEYS AT LAW

Eagleview Corporate Center
747 Constitution Drive
Suite 100
Exton, PA 19341-0673
Tel (610) 458-7500  Fax (610) 458-7337
www.foxrothschild.com

SAMUEL W. CORTES
Direct No:  610.458.4966
Email: SCortes@FoxRothschild.com

December 3, 2020

**VIA EMAIL (mavila@fisherphillips.com)**

Michael P. Avila, Esquire
Fisher & Phillips LLP
Two Logan Square, 12th Floor
100 N. 18th Street
Philadelphia, PA  19103

**Re:     Eric Meyerhoff**

Dear Mike:

This firm represents HCOS Group, LLC, and its affiliates and subsidiaries, including, but not limited to, ELAP Services, LLC (collectively, "HCOS").  We understand that you represent ClaimDOC, LLC ("ClaimDOC"), and write in response to Amy Pellegrin's letter to Troy Sisum, Esquire, dated November 27, 2020, regarding HCOS's former employee, Eric Meyerhoff.

As your client knows, employees of HCOS execute a Confidentiality Agreement, which includes a restrictive covenant prohibiting HCOS employees from working for a competitor of HCOS for a period of twelve (12) months after leaving HCOS (the "Non-Compete").  A copy of the Confidentiality Agreement executed by Mr. Meyerhoff dated May 21, 2019, is enclosed for your reference.

As Ms. Pellegrin acknowledges in her letter, Mr. Meyerhoff's employment with ClaimDOC, if any, is a clear breach of the Non-Compete's express terms.  We are awaiting confirmation from Mr. Meyerhoff as to whether he in fact intends to work for ClaimDOC.

As to Ms. Pellegrin's assessment of Pennsylvania law with respect to the enforceability of the Non-Compete, she is wrong.  "Nationwide non-compete restrictions are enforceable under

A Pennsylvania Limited Liability Partnership

| California | Colorado | Delaware | District of Columbia | Florida | Georgia | Illinois | Minnesota | Nevada |
| New Jersey | New York | North Carolina | Pennsylvania | South Carolina | Texas | Virginia | Washington |

116637747



December 3, 2020
Page 2

Pennsylvania law where the former employer does business on a nationwide scale." <u>Nextgen Healthcare Info. Sys., Inc. v. Messier</u>, No. 05-CV-5230, 2005 WL 3021095, at *13 (E.D. Pa. Nov. 10, 2005); <u>see</u>, <u>e.g.</u>, <u>Kramer v. Robec, Inc.</u>, 824 F. Supp. 508, 512 (E.D. Pa. 1992) ("Because [the former employer] and its competitors market their products in all fifty states, the [nationwide] geographic scope of the restrictive covenant is not unreasonable.")).

During his employment with HCOS, Mr. Meyerhoff's responsibilities included selling HCOS's products and services to customers in all fifty states through HCOS's brokers and third-party administrator partners. HCOS provided Mr. Meyerhoff with access to HCOS's confidential and proprietary information relating to HCOS's current and prospective customers, brokers, and third-party administrator partners located across the United States. The nationwide scope of the Non-Compete is, therefore, reasonable and necessary to protect HCOS's interests because (1) HCOS markets and sells its products and services in all fifty states, (2) Mr. Meyerhoff had access to HCOS's confidential and proprietary information relating to *all* of Plaintiffs' current and prospective customers, and (3) Mr. Meyerhoff developed relationships with HCOS's customers, brokers, and third-party administrator partners through HCOS's efforts and, in fact, solicited and sold to customers in all fifty states. <u>See</u>, <u>e.g.</u>, <u>Nextgen Healthcare Info. Sys., Inc.</u>, 2005 WL 3021095, at *13; <u>Kramer</u>, 824 F. Supp. at 512.

On a broader scale, ClaimDOC's hiring of Mr. Meyerhoff, if any, just months after ClaimDOC hired Omar Arif – another former HCOS sales employee – suggests that ClaimDOC is engaging in a concerted effort to siphon HCOS's sales team. It certainly appears that ClaimDOC's unfair competition is intentional given the ongoing litigation between ClaimDOC and HCOS arising out of ClaimDOC's hiring of Mr. Arif and ClaimDOC's knowledge of the Non-Compete.

HCOS demands that ClaimDOC immediately terminate its efforts to form an employment relationship with Mr. Meyerhoff. If ClaimDOC fails to confirm, in writing, its compliance with this demand by 5:00 p.m. EST on Friday, December 4, 2020, HCOS will take all steps necessary to protect its rights.

Additionally, ClaimDOC is directed not to destroy, conceal, or alter any paper or electronic files, other data generated by or stored on any computer systems and storage media (*e.g.*, hard disks, floppy disks, backup tapes), or any other electronic data, such as voicemail. This includes, but is not limited to, the following: email and other electronic communications; word processing documents; spreadsheets; databases; calendars; telephone logs; contact manager information; Internet usage files; offline storage or information stored on removable media; information contained on laptops or other portable devices; and network access information. Electronic documents and the storage media on which they reside contain relevant, discoverable information beyond what may be found in printed documents. Therefore, even where a paper copy exists, we will seek all documents in their electronic form, along with metadata or


**Fox Rothschild** LLP
ATTORNEYS AT LAW

December 3, 2020
Page 3

information about those documents contained on the media. Failure to preserve such files in their current state may subject ClaimDOC to further damages and sanctions.

HCOS reserves all rights, waiving none.

Very truly yours,

Samuel W. Cortes, Esquire

Enclosure

116637747

**CONFIDENTIALITY AGREEMENT**

This **Confidentiality Agreement**, is entered into as of _5/21/19_ , by and between **HCOS Group LLC, and its affiliates and subsidiaries** (the "Company"), having its principal office at 1550 Liberty Ridge Dr. Ste. 330 Wayne, PA 19087; and _ERIC MEYERHOFF_ ("Employee"), an individual residing _9170 Green Pond Rd. Newfoundland, NJ 07435_ at

**WITNESSETH:**

**Whereas,** the Company has developed confidential and proprietary systems and processes which are designed to perform services to the benefit of healthcare payers, and their members and beneficiaries;

**Whereas,** the Company's systems and processes are extremely valuable and includes confidential and proprietary information obtained from various sources;

**Whereas,** the Company provides certain medical claims processing, health care cost-containment, consulting and other ministerial services for Employee Health and Welfare Benefit Plans (as defined in the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) (the "Plans" or "Covered Entities"), third-party administrators, and other service providers to healthcare payers;

**Whereas,** the Employee is a member of the Company's workforce, and the Company agrees to disclose certain confidential and proprietary information relating to Company, its clients and business relationships for the purpose of employment with Company ("the Purpose");

**Whereas,** to provide such services to the Plans, both the Company and Employee will have Access to certain confidential and proprietary information, and electronic protected health information ("Electronic Protected Health Information" or "Electronic PHI"), as defined in the Security Standards for the Protection of Electronic Protected Health Information (the "Security Standards") set forth by the U.S. Department of Health and Human Services ("HHS") pursuant to the Health Insurance Portability and Accountability Act of 1996, as amended ("HIPAA");

**Whereas,** the Company is committed to ensuring the protection of confidential and proprietary information and the Security of Electronic PHI and at all times shall comply with the requirements of the Security Standards; and

**Whereas,** the Company believes that it is prudent to require that each of its Employees enter into this Agreement to ensure the protection of the confidential and proprietary information and the Electronic PHI to which the Employees have Access.

**Now, therefore,** as material consideration for my employment or continued employment with, or with any of its affiliated companies (collectively, the "Company") and for the compensation which has been received, or will receive in connection with employment, and in consideration of the mutual covenants and agreements hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

1.   **CONFIDENTIALITY**

    1.1   **Confidential Information.** Employee recognizes that the Company now possesses or will possess information of a confidential or secret nature which has commercial value in the business in which the Company is engaged (hereinafter referred to as "Confidential Information"). Confidential Information for this purpose includes but is not limited to trade secrets, business strategies, processes, data, know-how, inventions, improvements, techniques, formulas, marketing plans, product plans, forecasts, discounts, pricing lists, client and customer lists, and other information relating to the purpose, benefits, use and operations of Company, whether belonging to the Company or to any of its customers or suppliers. Employee understands that employment with the Company creates a relationship of trust and confidence between Employee and the Company with respect to the Confidential Information that Employee may learn or develop during the period of employment with the Company.

A. Company Information

Employee agrees at all times during the term of my employment and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation, without written authorization of Company's CEO, any Confidential Information of the Company.

Employee understands that "Confidential Information" means any information requested and/or received from or on behalf of Company, its affiliated entities or their agents, representatives, subsidiaries, and shall include, without limitation, Company's capabilities; financial information; internal business practices; business plans; business strategies; business processes and procedures; procurement requirements; program and product development; current, past or potential customers, investors, employees, and other business and contractual relationships; business records, including but not limited to, financial information, business forecasts, sales and merchandising, provider information, marketing plans, sales and marketing research; inventions; know how; information technology; databases; technology programs and algorithms; routines; techniques; software source documents; works of authorship, including, without limitation, forms of agreements (whether or not protected by federal copyright law); and other confidential and proprietary information of Company's which are commercially valuable and proprietary or comprise a trade secret, in each case, whether in oral, written, recorded, contained on tape or electronic or other "perceivable" form.

Confidential Information shall also include financial arrangements with business associates and/or business partners, including without limitation, reimbursement rates, payment rates, fee and pricing schedules and methodologies, payment methodologies, negotiation and engagement strategies, and other contractual terms negotiated by Company and/or its agents with clients and medical providers. Confidential Information includes the foregoing types of information obtained from or owned by third parties. Confidential Information includes without limitation, personal information concerning employees or members, medical information including diagnosis, treatment or benefit administration of any member, financial information relating to employees, hospitals, physicians and provider-specific information related to audit proceedings, quality review, malpractice suits and peer-review determinations.

Confidential Information is not limited to documents, but includes any of the aforementioned information, whether tangible or intangible, and shall also include all copies (whether in paper, electronic, digital or other form), excerpts thereof, and all derivations. Derivations shall include, without limitation, using, reviewing, replicating in any way, recreating, modifying, reverse engineering or otherwise reconstructing, decomposing, disassembling, combining with or incorporating in other material, creating or adding to a data base or other compilation, selling, leasing, transferring and creating derivative works.

Employee further understands that Confidential Information does not include any of the foregoing items that have become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved. In the event that it is required by law to disclose any Confidential Information, Employee will give the Company prompt advance written notice thereof and will provide the Company with reasonable assistance, at the sole expense of the Company, in obtaining an order to protect the Confidential Information from public disclosure.

B. Former Employer Information

Employee agrees that it will not, during employment with Company, improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and that Employee will not bring into the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

C. Third-Party Information

Employee recognizes that the Company has received and in the future will receive from third-parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Employee agrees to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out work for the Company consistent with the Company's agreement with such third-party.

  1.2  **Ownership and Assignment**. Employee agrees that all Confidential Information is the sole property of the Company and its assigns. Employee will promptly disclose all Confidential Information to the Company upon request, and will assign to the Company any rights which may have or which may acquire in any Confidential Information.

  1.3  **Obligations Not to Disclose**. At all times, both while employed with the Company and after the termination of my employment with the Company, Employee will keep in strict confidence all Confidential Information and Employee will not use or disclose any Confidential Information or anything relating to it in

whole or in part, nor permit others to use or disclose it in any way, without prior written consent of the Company, except as may be necessary in the ordinary course of performing my duties as an employee of the Company.

1.4     **Obligations upon Termination of Employment.**  Upon termination of employment with the Company for any reason, Employee will promptly deliver to the Company all materials, documents, data, equipment, and other physical property of any nature containing or pertaining to any Confidential Information, and Employee will not take from the Company's premises any such material or equipment or any reproduction thereof.

1.5     **Notification to New Employer.**  In the event that Employee leaves the employ of Company, and becomes employed by an employer engaged in or which proposes to be engaged in a business competitive with any business which the Company was engaged during the term of employment or in which during the term of employment the Company proposed to enter or become engaged in, Employee hereby grants consent to notification by the Company to Employee's new employer about my rights and obligations under this Agreement.

2.     **COVENANTS**

2.1     **Non-Competition.**  In consideration for and as an inducement to Company to enter into this Agreement, Employee covenants and agrees that during the service and for a period of twelve (12) months following the termination thereof for any reason (the "Non-Compete Period"), Employee shall not, directly or indirectly, anywhere in the Restricted Area, either for Employee or through any other person, have an ownership interest in, manage, participate, operate, control, permit his or her name to be used by, perform services for or otherwise become involved in (whether as an officer, director, manager, employee, investor, partner, proprietor, stockholder, member, trustee, consultant, agent, representative, broker, promoter or otherwise) any Competing Business. Notwithstanding the foregoing, nothing in this section shall prohibit (i) Employee from having a passive ownership interest of not more than one percent (1.0%) of any publicly traded entity whose securities have been registered under the Securities Act of 1933, as amended, or Section 12 of the Securities Exchange Act of 1934, as amended, so long as Employee does not participate in any way in the management, operation or control of such public traded entity; or (ii) from engaging in any activities or performing any services in connection with services with the employer after the Effective Date.  For the purpose of this Agreement, the term (x) "Competing Business" shall mean any business that develops, sells or otherwise provides any services that compete with (A) products or services developed, sold or otherwise provided by Company during the three (3) year period prior to the date of the termination of my service; or (B) products or services specifically planned to be developed, sold or otherwise provided by Company in the future as documented by a written plan or disclosed to myself as Confidential Information within the two (2) year period prior to the date of the termination of my service, and (y) "Restricted Area" shall mean all states, territories (and the District of Columbia, as applicable) in which Company conducted business during the four (4) year period prior to the date of the termination of my service and all states and territories (and the District of Columbia, as applicable) in which Employee called on customers or performed other services for Company during the same period.

Employee further agrees that the phrase "directly or indirectly compete" shall include owning, managing, operating, or controlling, or participating in the ownership, management, operation, or control of, or being connected with or having any interest in, as a stockholder, director, officer, employee, agent, consultant, assistant, advisor, sole proprietor, partner or otherwise, any business which develops and leases high performance health provider networks that share competitive similarities with the Company's network offering; provided, however, that this prohibition shall not apply to my ownership of less than five percent (5%) of the voting stock in companies whose stock is traded on a national securities exchange or in the over-the-counter market.

2.2     **Non-Solicitation and Non-Interference.**  During the Restricted Period, Employee will not, directly or indirectly, either for Employee or through any other person or entity, (i) induce or attempt to induce any current or former (within the past twelve (12) month period) employee to leave the employ of Company, or in any way interfere with the relationship between such employee and Company, (ii) hire any current or former employee (within the past twelve (12) month period) of Company or (iii) call on, solicit or service any current Company customer or client or competitive with those Services offered by ELAP during the two (2) year period prior to the date of the termination of service or induce or attempt to induce such person to cease doing or decrease its business with Company, or in any way interfere with the relationship between any customer, vendor, broker, third-party administrator or other business relation and Company (including making any negative statement or communication that is intended to or could reasonably be expected to disparage Company).

2.3     **Mutual Non-Disparagement.**  Each party will not, in any manner, directly or indirectly, make any oral or written statement to any person that disparages or places the other party in a false or negative light; provided, however, that each party shall not be required to make any untruthful statement or to violate any law.  The foregoing will not be violated by truthful non-disparaging statements made by Company or Employee, as applicable, in response to legal process, required governmental testimony or filings, or administrative or arbitral proceedings (including, without limitation, in connection with such proceedings).

2.4     **Enforceability.**  If any of the provisions of this Section 2 is held to be unenforceable, the remaining provisions shall nevertheless remain enforceable, and the court making such determination shall

modify, among other things, the scope, duration, or geographic area of this Section to preserve the enforceability hereof to the maximum extent then permitted by law. In addition, the enforceability of this Section is also subject to the injunctive and other equitable powers of a court.

**Acknowledgment; Enforcement.**

(a)      I acknowledge that I am subject to the obligations set forth above (collectively, the "Restrictive Covenants").

(b)      I understand that the Restrictive Covenants may limit his or her ability to earn a livelihood in a business similar to the business of the Company, but I nevertheless believe that I have received and will receive sufficient consideration and other benefits in connection with my service with the Company and to clearly justify such Restrictive Covenants which, in any event (given my education, skills and ability), I do not believe would prevent myself from otherwise earning a living.  I have carefully considered the nature and extent of the Restrictive Covenants, and hereby acknowledge and agree that the same are reasonable, do not confer a benefit upon the Company disproportionate to the detriment of myself, are reasonable in time, scope and territory and necessary for the protection of the Company.

(c)      Because my services are unique and because I will have access to Confidential Information upon signing this agreement, the parties hereto agree that money damages would be an inadequate remedy for any breach of this Agreement.  Therefore, in the event of a breach or threatened breach of this Agreement or of the Restrictive Covenants, the Company or its successors or assigns may, in addition to other rights and remedies existing in their favor at law or in equity, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce, or prevent any violations of, the provisions hereof (without posting a bond or other security) or require myself to account for and pay over to the Company all compensation, profits, moneys, accruals, increments or other benefits derived from or received as a result of any transactions constituting a breach of the Restrictive Covenants, if and when the final and non-appealable judgment of a court of competent jurisdiction is so entered against myself.  I agree that these covenants are necessary for the protection of Company's legitimate business interests and are reasonable in scope and content.  This Section shall survive the expiration or termination of this Agreement.

(d)      If any Restrictive Covenant is unenforceable with respect to the duration and geographic area of restriction of such Restrictive Covenant, then the duration and geographic area of restriction shall be reduced to the maximum duration and geographic area of restriction deemed legal, valid and enforceable and that come closest to expressing the intention of the parties with respect to the covenant, and the covenant shall be enforceable as so modified.  The parties agree that a court with proper jurisdiction shall be allowed to reduce the Restrictive Covenants to the maximum duration and geographic area of restriction deemed legal, valid and enforceable.

(f)      The forfeiture provisions in this Agreement shall continue to apply, in accordance with their terms, after the provisions of any employment or other agreement between the Company and Employee have lapsed.

(g)      I covenant and agree that I will not seek to challenge the enforceability of the Restrictive Covenants against Company, nor will I assert as a defense to any action seeking enforcement of the Restrictive Covenants (including an action seeking injunctive relief) that such provisions are not enforceable due to lack of sufficient consideration received by myself.

3.      **WORK PRODUCT/INVENTIONS**

3.1      **Disclosure of Work Product**. If Employee conceives, learns, makes, or first reduces to practice, either alone or jointly with others, any inventions, improvements, processes, plans, original works of authorship, formulas, processes, computer programs, techniques, innovations, technical information, systems, software developments, methods, designs, analyses, drawings, formal opinions and memos, reports, service marks, trademarks, trade names, trade dress, logos and all similar or related information (whether patentable or unpatentable) which relates to the actual or anticipated business, operations, research and development or existing or future products or services of Company and which are conceived, developed or made by myself (whether or not during usual business hours and whether or not alone or in conjunction with any other person) during the period of my service together with all patent applications, letters patent, trademark, trade name and service mark applications or registrations, copyrights and reissues thereof that may be granted for or upon any of the foregoing, know-how, or data in any way related to or useful in the Company's business (hereinafter referred to as "Work Product") while employed by the Company, Employee will promptly disclose such Work Product to the Company or to any person designated by it. Employee recognizes and agrees that the Work Product, to the extent copyrightable, constitutes works for hire under the copyright laws of the United States.

3.2      **Ownership, Assignment, Assistance, and Power of Attorney**. All Work Product which the

Company determines in its sole discretion to be related to or useful in the Company's business or in the research and development of the Company's business or which result from work performed by Employee for the Company shall be the sole and exclusive property of the Company, and the Company shall have the right to use and to apply for patents, copyrights, or other statutory or common law protections for such Inventions in any country. Employee hereby assigns to the Company any rights which have been acquired or which may be acquired in such Work Product. Furthermore, Employee will assist the Company in every proper way at the Company's expense to obtain patents, copyrights, and other statutory or common law protections for such Inventions in any country and to enforce such rights from time to time. Specifically, Employee will execute all documents as the Company may use in applying for and in obtaining or enforcing such patents, copyrights, and other statutory or common law protections, together with any assignments thereof to the Company or to any person designated by the Company. Employee's obligations under this paragraph shall continue beyond the termination of employment with the Company, but the Company shall compensate me at a reasonable rate after such termination for the time which Employee actually spends at the Company's request in rendering such assistance. In the event the Company is unable for any reason whatsoever to secure Employee's signature to any lawful document required to apply for or to enforce any patent, copyright, or other statutory or common law protections for such Work Product, Employee hereby irrevocably and severally designate and appoint the Company and its duly authorized officers and agents as Employee's agents and attorneys-in-fact to act in Employee's stead to execute such documents and to do such other lawful and necessary acts to further the issuance or prosecution of such patents, copyrights, and other statutory or common law protections, and Employee hereby declares that such documents or such acts shall have the same legal force and effect as if such documents were executed by Employee or such acts were done by Employee.

3.3     **Exclusion of Prior Work Product**. Employee has identified on **Exhibit A** attached hereto a complete list of all Work Product which Employee has conceived, learned, made or first reduced to practice, either alone or jointly with others, prior to my employment with the Company relating to or useful in the operation of the Company's business which Employee desires to exclude from the restrictions of this Agreement. If no Work Product is listed on **Exhibit A**, Employee represent that he/she has made no such Work Product at the time of signing this Agreement.

# 4.   CONFLICTS

4.1     **Prior Agreement and Conflicting Employment**. Employee represents that, to the best of his/her knowledge, Employee's performance of all the terms of this Agreement and work as an employee of the Company does not breach any oral or written agreement which Employee has made to keep in confidence proprietary information acquired prior to employment with the Company. Employee agrees that, during the term of my employment with Company, Employee will not engage in any other employment, occupation, consulting or other business activity related to the business in which the Company is now involved or becomes involved during the term of employment, nor will he/she engage in any other activities that conflict with my obligations to the Company.

4.2     **Materials of Prior Employers**.   Employee represents that he/she has not used nor will he/she use in the performance of the duties for the Company any materials or documents of a former employer which are not generally available to the public, unless Employee has first obtained written authorization form the former employer for their possession and use and have delivered a copy of such written authorization to the Company before use of such materials or documents in connection with the performance of the duties for the Company.

4.3     **Other Agreements**.   While Employee is employed by the Company, Employee will not enter into any oral or written agreement which conflicts with obligations under this Agreement or with the performance of work as an employee of the Company.

# 5.   PHI Duties and Obligations of the Employee

5.1.     **Electronic PHI Removed from Company's Premises**.  Any Employee who works at his or her home shall remove from the Company's premises only the minimum necessary amount of Electronic PHI that is specifically needed for the Employee to perform his or her job duties and shall place such Electronic PHI only at his or her home.  The Electronic PHI shall be returned to the Company's premises as soon as it is no longer needed by the Employee to perform his or her job duties.

5.2.     **Safeguarding Electronic PHI**.  Any Electronic PHI stored on a computer at an Employee's home shall be protected by a Password known only to the Employee, and any Electronic Media maintained at the Employee's home, excepting only Employee's computer hard drive, shall be stored in a locked area to which only the Employee has access.  The Employee shall take all Security Measures necessary to ensure that no one other than the Employee is able to view a monitor on which Electronic PHI is displayed (through limiting access of individuals to the room in which the Employee works and turning off the computer each time the Employee leaves the Workstation) and that such Electronic PHI is backed up on a daily basis.  In the event the Employee disposes of a hard drive containing Electronic PHI, he or she shall ensure that it is cleared of all Electronic PHI prior to disposal.  Further, the Employee shall ensure that any connection to the Company's Information Systems is secure.

5.3.     **Compliance**.  Employee agrees to fully comply with all applicable federal, state and local laws, statutes, regulations and ordinances, including, but not limited to the requirements of HIPAA and its

implementing regulations (45 C.F.R. Parts 160-64) and the requirements of the Health Information Technology for Economic and Clinical Health Act, as incorporates in the American Recovery and Reinvestment Act of 2009 (the "HITECH Act").

5.4. **Email Transmissions.** In the event Electronic PHI is sent or received by email at the Employee's home, the Employee shall ensure that no one has Access to such email and that the email transmissions are Confidential.

5.5. **Other Policies.** The Employee shall comply with all other policies and procedures of the Company relating to Electronic PHI and other workplace rules.

## 6. Term and Termination.

6.1. **Term.** The term of this Agreement shall be effective as of the date set forth above in the first paragraph and shall terminate when all of the Electronic PHI provided by a Covered Entity or the Company to the Employee, or created or received by the Employee on behalf of a Covered Entity or the Company, is destroyed or returned to the Company.

6.2. **Effect of Termination.** Upon termination of this Agreement, for any reason, the Employee shall return or destroy all Electronic PHI received from a Covered Entity or the Company, or created or received by the Employee on behalf of a Covered Entity or the Company. The Employee shall retain no copies of Electronic PHI. Upon one (1) week's prior written notice from the Company, the Employee shall permit representatives of the Company to enter his or her home and inspect any Workstation and computer to verify that no Electronic PHI remains at the Employee's home.

## 7. MISCELLANEOUS

7.1 **No Obligation to Employ.** This Agreement does not constitute a contract of employment nor does it create an implied obligation of the Company to employ me for any certain period of time. Employee acknowledges that he/she is an at-will employee and that he/she can leave the Company at any time and the Company can terminate his/her employment at any time for any reason.

7.2 **Entire Agreement; Modification.** Along with the Internet Policy, this Agreement constitutes the entire agreement between the Company and me with respect to the subject matters covered by it and supersedes all prior oral or written agreements between the Company and me relating to such matters. No provision of this Agreement may be modified, except in writing, signed by the parties, and except to comply with the requirements of the Security Standards and HIPAA.

7.3 **No Third Party Beneficiaries.** There shall be no third party beneficiaries to this Agreement, and no individual (including an "Individual" as defined in 45 C.F.R. § 160.103 or entity who is not a party to this Agreement shall have any rights in connection with a breach or violation of this Agreement.

7.4 **Binding Effect.** This Agreement shall be binding upon the parties hereto and their successors and assigns heirs, executors, administrators and other legal representatives and will inure to the benefit of the Company, its successors, and assigns.

7.5 **Severability.** If any provision of this Agreement is held by a court of competent jurisdiction to be void or unenforceable for any reason, the remaining provisions of this Agreement shall nevertheless continue in full force and effect.

7.6 **Governing Law; Consent to Personal Jurisdiction; Waiver of Jury Trial.** This Agreement will be governed by the laws of the Commonwealth of Pennsylvania. Employee hereby expressly consents to the personal jurisdiction of the state and federal courts located in Pennsylvania for the resolution of any and all disputes arising from or relating to this Agreement. **If any dispute between the parties arises which results in litigation, the parties agree to waive any right that the party may have to a trial by jury and agree that the dispute will be determined solely by a judge.**

7.8 **Effective Date.** This Agreement will be effective as of the date set forth on the signature page hereof.

**IN WITNESS WHEREOF,** the parties have executed this document, intending to be legally bound, as of the date set forth below.

Dated: _____5/21/19_____

HCOS GROUP, LLC

By: _____

Name: _____

Title: _____

**EMPLOYEE**

By: _____

Name (Print): _____ERIC MEYERHUFF_____

EXHIBIT  F

**Archived:** Saturday, December 12, 2020 1:42:41 PM
**From:** DeLucia, Andrew M.
**Sent:** Fri, 11 Dec 2020 14:29:44
**To:** Cortes, Samuel W.
**Cc:** Avila, Michael Chernesky, Jean C. Ryan, Danielle McKenna, Lauren P. Stief, Christopher Martin, Jared R.
**Subject:** [EXT] RE: Eric Meyerhoff/ClaimsDocs/ELAP Services
**Sensitivity:** Normal

---

Sam-

I believe that I have responded to your questions appropriately.  To my knowledge, there is no evidence that Mr. Meyerhoff has done anything inappropriate.  Your letter did not include any evidence of misconduct.  He has been gone for two weeks now, so I presume your client has had a chance to review his activities and has found nothing inappropriate.  If you have any evidence that Mr. Meyerhoff has done anything wrong, please share it and I will certainly review.

I have confirmed for you that Mr. Meyerhoff is working at ClaimDOC, I have confirmed that he will not be working in the same territory as he worked for Plaintiffs, and that he did not take/retain and any confidential information or provide any to ClaimDOC.  I suspect, however, that my responses are immaterial to your clients' intention on whether or not to file a lawsuit.

Again, I will review anything you provide that you believe suggest that Mr. Meyerhoff did anything wrong, and I continue to look forward to hearing your clients' position on the non-competition and compensation issues.  I remain happy to discuss those at any time.

Andrew

**From:** Cortes, Samuel W. <SCortes@foxrothschild.com>
**Sent:** Friday, December 11, 2020 2:13 PM
**To:** DeLucia, Andrew M. <ADeLucia@rubinfortunato.com>
**Cc:** Avila, Michael <mavila@fisherphillips.com>; Chernesky, Jean C. <JChernesky@foxrothschild.com>; Ryan, Danielle <DRyan@foxrothschild.com>; McKenna, Lauren P. <LMcKenna@foxrothschild.com>; Stief, Christopher <cstief@fisherphillips.com>; Martin, Jared R. <JMartin@rubinfortunato.com>
**Subject:** RE: Eric Meyerhoff/ClaimsDocs/ELAP Services

Andrew:

My questions are broader than your responses.

We are evaluating whether a lawsuit is necessary to protect my client's interests here.  You claim it is not, so a prompt and complete answer is appreciated.

When did he accept the offer ?  And did he take or provide anything belonging to my client?  I don't know that we agree on what constitutes "confidential information."

**Samuel Cortes**
Partner
**Fox Rothschild LLP**
Eagleview Corporate Center
747 Constitution Drive, Suite 100, PO Box 673
Exton, PA 19341
(610) 458-4966 - direct
(610) 458-7337- fax
SCortes@foxrothschild.com
www.foxrothschild.com

**From:** DeLucia, Andrew M. <ADeLucia@rubinfortunato.com>
**Sent:** Friday, December 11, 2020 2:08 PM
**To:** Cortes, Samuel W. <SCortes@foxrothschild.com>
**Cc:** Avila, Michael <mavila@fisherphillips.com>; Chernesky, Jean C. <JChernesky@foxrothschild.com>; Ryan, Danielle <DRyan@foxrothschild.com>; McKenna, Lauren P. <LMcKenna@foxrothschild.com>; Stief, Christopher <cstief@fisherphillips.com>; Martin, Jared R. <JMartin@rubinfortunato.com>
**Subject:** [EXT] RE: Eric Meyerhoff/ClaimsDocs/ELAP Services

Sam-

Thanks for your email.

1. Mr. Meyerhoff resigned from HCOS on November 27, 2020, shortly after receiving an offer of employment.  He took a week off and started with ClaimDOC on December 3, 2020.
2. Mr. Meyerhoff did not take and/or retain any of HCOS's confidential information, and did not provide any to ClaimDOC.

I look forward to hearing your clients' responses on the non-competition and compensation matters.

Andrew

**From:** Cortes, Samuel W. <SCortes@foxrothschild.com>
**Sent:** Friday, December 11, 2020 2:01 PM
**To:** DeLucia, Andrew M. <ADeLucia@rubinfortunato.com>

Cc: Avila, Michael <mavila@fisherphillips.com>; Chernesky, Jean C. <JChernesky@foxrothschild.com>; Ryan, Danielle <DRyan@foxrothschild.com>; McKenna, Lauren P. <LMcKenna@foxrothschild.com>; Stief, Christopher <cstief@fisherphillips.com>; Martin, Jared R. <JMartin@rubinfortunato.com>
**Subject:** RE: Eric Meyerhoff/ClaimsDocs/ELAP Services


Please respond to the below questions today if your client intends to do so.  Thank you.


**Samuel Cortes**
**Partner**
**Fox Rothschild LLP**
**Eagleview Corporate Center**
**747 Constitution Drive, Suite 100, PO Box 673**
**Exton, PA 19341**
**(610) 458-4966 - direct**
**(610) 458-7337- fax**
SCortes@foxrothschild.com
www.foxrothschild.com


**From:** Cortes, Samuel W.
**Sent:** Thursday, December 10, 2020 8:15 PM
**To:** 'DeLucia, Andrew M.' <ADeLucia@rubinfortunato.com>
**Cc:** Avila, Michael <mavila@fisherphillips.com>; Chernesky, Jean C. <JChernesky@foxrothschild.com>; Ryan, Danielle <DRyan@foxrothschild.com>; McKenna, Lauren P. <LMcKenna@foxrothschild.com>; Stief, Christopher <cstief@fisherphillips.com>; Martin, Jared R. <JMartin@rubinfortunato.com>
**Subject:** RE: Eric Meyerhoff/ClaimsDocs/ELAP Services

Andrew:  Before we can respond to your letter on the non-competition and compensation questions, we have questions that we need answered.

1)  When did Meyerhoff accept employment at ClaimDOC?
2)  Your letter claims that Meyerhoff does not "retain" any of my client's confidential information.  Did he take any of my client's information with him?  If so, what did he take?  Did he give any of what he took to ClaimDOC?  If so, what?

After we receive responses to the above, I will review them with the client and hopefully be in a position to have a discussion with you tomorrow afternoon.

Thanks.


**Samuel Cortes**
**Partner**
**Fox Rothschild LLP**
**Eagleview Corporate Center**
**747 Constitution Drive, Suite 100, PO Box 673**
**Exton, PA 19341**
**(610) 458-4966 - direct**
**(610) 458-7337- fax**
SCortes@foxrothschild.com
www.foxrothschild.com


**From:** DeLucia, Andrew M. <ADeLucia@rubinfortunato.com>
**Sent:** Thursday, December 10, 2020 4:52 PM
**To:** Cortes, Samuel W. <SCortes@foxrothschild.com>
**Cc:** Avila, Michael <mavila@fisherphillips.com>; Chernesky, Jean C. <JChernesky@foxrothschild.com>; Ryan, Danielle <DRyan@foxrothschild.com>; McKenna, Lauren P. <LMcKenna@foxrothschild.com>; Stief, Christopher <cstief@fisherphillips.com>; Martin, Jared R. <JMartin@rubinfortunato.com>
**Subject:** [EXT] RE: Eric Meyerhoff/ClaimsDocs/ELAP Services

Sam-

Please see the attached.

Thanks.

Andrew

**From:** Cortes, Samuel W. <SCortes@foxrothschild.com>
**Sent:** Tuesday, December 8, 2020 4:38 PM
**To:** DeLucia, Andrew M. <ADeLucia@rubinfortunato.com>
**Cc:** Avila, Michael <mavila@fisherphillips.com>; Chernesky, Jean C. <JChernesky@foxrothschild.com>; Ryan, Danielle <DRyan@foxrothschild.com>; McKenna, Lauren P. <LMcKenna@foxrothschild.com>
**Subject:** Eric Meyerhoff/ClaimsDocs/ELAP Services


Dear Andrew:  I understand from our conversation that you are representing Mr. Meyerhoff in the referenced matter.  Attached are two letters sent by or on behalf of our client, neither of

which has received a response, as well as a compensation memo sent to Mr. Meyerhoff last week.  Please let me know by the close of business on Thursday, December 10, 2020, if a response is forthcoming.  Thank you.

**Samuel W. Cortes**
Attorney at Law
**Fox Rothschild LLP**
Eagleview Corporate Center
747 Constitution Drive, Suite 100
Exton, PA 19341
(610) 458-4966 - direct
(610) 458-7337 - fax
scortes@foxrothschild.com
www.foxrothschild.com

This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

EXHIBIT  G

**From:** Eric Meyerhoff <emeyerhoff@claim-doc.com>
**Date:** Tuesday, December 22, 2020 at 9:23 AM
**To:**
**Subject:** Reference Based Pricing / Schedule brief meeting week of January 18th

Good morning;

I hope you and yours have a healthy, safe and happy holiday season.. I wanted to reach out and schedule a brief 23 minute meeting to review ClaimDOC and our Reference Based Pricing solutions.

More than happy to schedule an in person, (social safe guidelines) or virtual meeting.

Please let me know what works best for you.

Kindest regards;

Eric



**Eric Meyerhoff**
**Vice President of Business Development**
914-574-3065
emeyerhoff@claim-doc.com
www.claim-doc.com

Notice of Confidentiality: The information included and/or attached in this electronic mail transmission may contain confidential or privileged information and is intended for the addressee. Any unauthorized disclosure, reproduction, distribution or the taking of action in reliance on the contents of the information is prohibited. If you believe that you have received the message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.

| | |
|---|---|
| HCOS GROUP, LLC, et al. | IN THE COURT OF COMMON PLEAS |
| | CHESTER COUNTY, PENNSYLVANIA |
| Plaintiffs, | |
| | CIVIL ACTION - LAW |
| v. | |
| | NO. *202009428 -CT* |
| ERIC MEYERHOFF, et al., | |
| | |
| Defendants. | |

## <u>ORDER GRANTING TEMPORARY INJUNCTION TO PLAINTIFFS</u>

**AND NOW**, this _____ day of _____, 2020, upon consideration of the

Petition for Temporary and Preliminary Injunctive Relief (the "Petition") filed by Plaintiffs,

HCOS Group, LLC ("HCOS Group"), HCOS Services, LLC ("HCOS Services"), ELAP

Services, LLC ("ELAP"), and Imagine Health, Inc. ("Imagine") (collectively, "Plaintiffs"), it is

hereby **ORDERED** as follows:

1.      Defendants, Eric Meyerhoff ("Meyerhoff") and ClaimDOC, LLC ("ClaimDOC")

(together, "Defendants"), are hereby enjoined and prohibited from using and/or disclosing any

confidential, proprietary, and trade secret information belonging to Plaintiffs, including, but not

limited to, Plaintiffs' customer lists, prospect lists, broker lists, marketing strategies, business

development proposals, pricing strategies, customer preferences, costs and processes, profit

margins, confidential information relating to Plaintiffs' third-party administrator partners, and

other confidential business information and trade secrets (collectively, the "Confidential

Information");

2.      Meyerhoff is further enjoined and prohibited from working for Defendant,

ClaimDOC, LLC, or any affiliates of same, or any other competitor of Plaintiffs for one year

from the date of entry of this Order;

3.      Defendants are further enjoined and prohibited from destroying and/or deleting any of Plaintiffs' Confidential Information that is in Defendants' possession and/or control and shall preserve same until further Order from this Court;

4.      In accordance with the provisions of Pa. R.C.P. 1531(b), Plaintiffs shall post with the Prothonotary security in the amount of $2,500.00;

5.      Plaintiffs shall serve a copy of this Order on Defendant; and

6.      A Rule to Show Cause as to why a preliminary injunction should not be ordered shall issue forthwith.

**BY THE COURT:**

_____
                                    J.

| | |
|---|---|
| HCOS GROUP, LLC, et al. | IN THE COURT OF COMMON PLEAS |
| | CHESTER COUNTY, PENNSYLVANIA |
|            Plaintiffs, | |
| | CIVIL ACTION - LAW |
|     v. | |
| | NO. *2020 - 09428 - CT* |
| ERIC MEYERHOFF, et al., | |
| | |
|            Defendants. | |

## <u>RULE TO SHOW CAUSE ORDER</u>

**AND NOW**, this _____ day of _____, 2020, upon consideration of the

Petition for Temporary and Preliminary Injunctive Relief (the "Petition") filed by Plaintiffs,

HCOS Group, LLC ("HCOS Group"), HCOS Services, LLC ("HCOS Services"), ELAP

Services, LLC ("ELAP"), and Imagine Health, Inc. ("Imagine") (collectively, "Plaintiffs"), it is

hereby **ORDERED** as follows:

      1.     A rule is issued upon Defendant, Eric Meyerhoff ("Meyerhoff") and ClaimDOC,

LLC ("ClaimDOC") (together, "Defendants"), to show cause why Plaintiffs are not entitled to

the relief requested;

      2.     Defendants shall file an answer to the Petition within <u>3</u> business days of service

upon Defendants – email service to counsel is sufficient;

      3.     A hearing on the Petition is hereby scheduled to be held on _____,

the _____ day of _____, 2020, at _____.M. in Courtroom No. _____, of the

Courthouse of Chester County, Pennsylvania; and

      4.     Plaintiffs shall serve a copy of this Order on Defendants.

                                          BY THE COURT:

                                       _____

                                                  J.

| | |
|---|---|
| HCOS GROUP, LLC, et al. | IN THE COURT OF COMMON PLEAS |
| | CHESTER COUNTY, PENNSYLVANIA |
| Plaintiffs, | |
| | CIVIL ACTION - LAW |
| v. | |
| | NO. 2020-09428-CT |
| ERIC MEYERHOFF, et al., | |
| | |
| Defendants. | |

## <u>ORDER GRANTING PRELIMINARY INJUNCTIVE RELIEF TO PLAINTIFFS</u>

**AND NOW**, this _____ day of _____, 2020, upon

consideration of Plaintiffs' Petition for Temporary and Preliminary Injunctive Relief, any

response thereto, a hearing having been held on the Petition, and upon good cause shown, it is

hereby **ORDERED** as follows:

      1.    The Petition is **GRANTED**;

      2.    Defendant, Eric Meyerhoff, is hereby enjoined and prohibited from working for

Defendant, ClaimDOC LLC, any of its affiliates, or any other competitor of Plaintiffs for one

year from the date of entry of this Order;

      3.    Defendants, Eric Meyerhoff and ClaimDOC, LLC (together, "Defendants"), are

hereby enjoined and prohibited from using and/or disclosing any of Plaintiffs' confidential,

proprietary, and/or trade secret information, including, but not limited to, Plaintiffs' customer

lists, prospect lists, broker lists, marketing strategies, business development proposals, pricing

strategies, customer preferences, costs and processes, profit margins, confidential information

relating to Plaintiffs' third-party administrator partners, and other confidential business

information and trade secrets (collectively, the "Confidential Information");

      4.    Defendants are further enjoined and prohibited from deleting and/or destroying

and of Plaintiffs' Confidential Information within Defendants' possession or control until further

Order from this Court.  Defendants shall produce all such information to Plaintiffs in a form of

Plaintiffs' choosing within 10 days of the date of entry of this Order and shall certify to Plaintiffs

and the Court that such production constitutes all of Plaintiffs' Confidential Information in

Defendants' possession.  Plaintiffs shall file a Praecipe confirming Defendants' compliance with

this obligation and informing the Court as to whether any additional relief is requested with

regard to Plaintiffs' Confidential Information and/or whether the Confidential Information in

Defendants' possession may be destroyed – sanctions shall issue upon application by Plaintiffs

for any noncompliance; and

      5.    In accordance with the provisions of Pa. R.C.P. 1531(b), Plaintiff shall post

security in the amount of $2,500.00.

**BY THE COURT:**

_____
                           J.

**FOX ROTHSCHILD LLP**
BY:  Lauren P. McKenna, Esquire
      Samuel W. Cortes, Esquire
      Danielle E. Ryan, Esquire
IDENTIFICATION NOS.: 59145/91494/314229
EAGLEVIEW CORPORATE CENTER
747 CONSTITUTION DRIVE, SUITE 100
EXTON, PA 19341-0673
Telephone: (610) 458-7500
Facsimile: (610) 458-7337                                    ATTORNEYS FOR PLAINTIFFS

| | |
|---|---|
| HCOS GROUP, LLC, et al.<br><br>                              Plaintiffs,<br><br>          v.<br><br>ERIC MEYERHOFF, et al.,<br><br>                              Defendants. | IN THE COURT OF COMMON PLEAS<br>CHESTER COUNTY, PENNSYLVANIA<br><br>CIVIL ACTION - LAW<br><br>NO. 2020-09428 - CT |

## PLAINTIFF'S PETITION FOR TEMPORARY
## AND PRELIMINARY INJUNCTIVE RELIEF

Plaintiffs, HCOS Group, LLC ("HCOS Group"), HCOS Services, LLC ("HCOS Services"), ELAP Services, LLC ("ELAP"), and Imagine Health, Inc. ("Imagine") (collectively, "Plaintiffs"), hereby file this Petition for Temporary and Preliminary Injunctive Relief pursuant to Pa. R.C.P. 1531 (the "Petition"), against Defendants, Eric Meyerhoff ("Meyerhoff") and ClaimDOC, LLC ("ClaimDOC") (together, "Defendants").

This is round two (to Plaintiffs' current knowledge) of ClaimDOC's attempt to steal Plaintiffs' business. ClaimDOC, a competitor of Plaintiffs from Iowa, unsuccessfully sought to acquire market share from Plaintiffs through competition. ClaimDOC's competitive efforts failed because Plaintiffs offer far superior products and far better service. Having failed at competing with Plaintiffs legitimately, ClaimDOC now does so illegitimately. Plaintiffs seek emergent relief from the Court now because Plaintiffs just discovered solicitations sent yesterday, December 22, 2020, by Defendants to customers, referral sources, and Plaintiffs' own

employees, with whom Meyerhoff worked while at Plaintiffs.  This conduct violates Plaintiffs' rights for the reasons discussed below and will cause immediate and irreparable harm to Plaintiffs if it continues.

Plaintiffs' hard work, ingenuity, and investments have allowed Plaintiffs to become a national leader for referenced based pricing products in the insurance market.  Based locally in Chester County, Plaintiffs operate nationally through 155 core employees located here in Chester County by relying on a national sales team of approximately 20 people.  Without this sales team, Plaintiffs' business would not be the success that it is, and the more than 155 jobs that Plaintiffs' success has created locally would be lost.

In the last few months, ClaimDOC has executed a strategy designed, with the knowledge and assistance of its own Chief Executive Officer and Chief Legal Officer, to steal Plaintiffs' business.  ClaimDOC has poached two of Plaintiffs' key sales executives, knowing that their fiduciary and contractual obligations to Plaintiffs precluded them from working for ClaimDOC.  Plaintiffs resolved the prior case involving ClaimDOC's hiring of Omar Arif ("Arif") before it learned of the circumstances surrounding Plaintiffs' hiring of Meyerhoff and after ClaimDOC made certain representations regarding Arif's role at ClaimDOC.  ClaimDOC's representations about Arif were false and intended to be false when made, and are the subject of a pending separate legal action.

The circumstances surrounding ClaimDOC's hiring of Meyerhoff - recently discovered and still being reviewed by Plaintiffs - are egregious. ***While still employed by Plaintiffs***, it appears that Meyerhoff worked for months for ClaimDOC (the "Corporate Espionage Months"). This scheme was orchestrated with the full knowledge and participation of not only the ClaimDOC sales team, but also ClaimDOC's Chief Executive Officer and Chief Legal Officer.

During the Corporate Espionage Months, ClaimDOC involved Meyerhoff in its sales efforts, including sales meetings.  At least one of those meetings occurred months before Meyerhoff announced his departure from Plaintiffs – in early September 2020.  Arif personally scheduled this meeting and invited Meyerhoff, ClaimDOC's Chief Executive Officer, and ClaimDOC's Chief Legal Officer - the same legal counsel who sat in on a telephone conference with the Court in the Arif matter - to attend.  Plainly, Arif and ClaimDOC's Chief Legal Officer knew that Meyerhoff worked for Plaintiffs when they included him in ClaimDOC's sales efforts.

During the Corporate Espionage Months, Meyerhoff also siphoned from Plaintiffs' their most confidential and proprietary information.  Meyerhoff even accessed a competitive analysis prepared by Plaintiffs about ClaimDOC itself.

Both ClaimDOC and Meyerhoff hid Meyerhoff's role as a ClaimDOC spy while Meyerhoff ostensibly continued his employment relationship with Plaintiffs.  In furtherance of ClaimDOC's elaborate, albeit misguided, scheme, ClaimDOC even provided Meyerhoff with his own ClaimDOC email account and email address for his use – all done ***months before*** he resigned from his employment relationship with Plaintiffs.

After learning of Meyerhoff's resignation, Plaintiffs submitted several requests to both Meyerhoff and ClaimDOC, seeking information to determine what had transpired.  ClaimDOC and Meyerhoff responded to Plaintiffs' inquiries by resorting to the ClaimDOC playbook:

- ClaimDOC engaged for Meyerhoff the exact same legal team that it engaged for Arif, presumably at ClaimDOC's cost; and

- ClaimDOC's chosen legal team either ignored Plaintiffs' inquires or sent "responses" described, at best, as evasive and noncommittal.

The request for relief set forth in this Petition is now emergent.  Plaintiffs has learned that yesterday, on December 22, 2020, Meyerhoff and ClaimDOC solicited business from Plaintiffs' customers, referral sources, and Plaintiffs' own employees, including, without limitation, those with whom Meyerhoff worked while employed by Plaintiffs.  It is now clear that ClaimDOC has hired Meyerhoff as part of an ongoing effort to steal Plaintiffs' business.

From a formal legal standpoint, Meyerhoff breached his fiduciary duties to Plaintiffs with the active assistance of ClaimDOC by working as a ClaimDOC spy for months for Plaintiffs. Meyerhoff also violated, and continues to violate, the Confidentiality Agreement and misappropriated, and continues to misappropriate, Plaintiffs' confidential, proprietary, and trade secret information, including, but not limited to, highly competitive and sensitive information relating to Plaintiffs' business and its current and prospective customers, brokers, and third-party administrator partners, and have tortiously interfered with Plaintiffs' current and prospective contractual relationships.  As evidenced by the solicitations that occurred yesterday, December 22, 2020, Plaintiffs will suffer irreparable harm, including lost market advantage and goodwill, if Defendants' improper and unlawful actions continue unabated.

Plaintiffs seek temporary and preliminary injunctive relief prohibiting (1) Meyerhoff from working for ClaimDOC, (2) Defendants from using or disclosing any of Plaintiffs' information, and (3) Defendants from deleting or destroying any of Plaintiffs' information in Defendants' possession or control pending discovery and a forensic examination of Defendants' computers, devices, and email accounts.  In further support, Plaintiffs aver as follows:

## BACKGROUND

### The Parties

1.    HCOS Group, with its affiliated entities, including ELAP and Imagine, assists middle market and local government employers that offer health benefits through self-funded plans, by developing transparent, rational methods of reimbursing medical providers.  [See Plaintiffs' Complaint, ¶¶ 9-12].

2.    Plaintiffs sell their services and products, including, but not limited to, those identified above, in markets across the country, by developing and maintaining relationships with brokers and third-party administrator partners, among other things.  [Id., ¶ 13].

3.    Plaintiffs employ approximately 155 people in Chester County, Pennsylvania.  [Id., ¶ 14].

4.    ClaimDOC operates out of Iowa.  [Id., ¶ 15].

5.    ClaimDOC competes with Plaintiffs in the same markets, offering products and services that it purports are similar to those offered by Plaintiffs.  [Id., ¶ 16].

6.    Both ClaimDOC and Plaintiffs, through ELAP, provide reference-based pricing services to employers in markets across the country.  [Id., ¶ 17].

### B.    Plaintiffs Hire Meyerhoff

7.    On May 21, 2019, Plaintiffs offered Meyerhoff the position of Director of Business Development at Plaintiffs, contingent upon, among other things, Meyerhoff's acceptance in full of the terms of a confidentiality agreement (the "Confidentiality Agreement").  [Id., ¶ 23].

8.    On May 21, 2019, Meyerhoff agreed to the terms of the Confidentiality Agreement.  [Id., ¶ 24].

9.    The Confidentiality Agreement provides, in pertinent part, as follows:

1.1    **Confidential Information.**  Employee recognizes that the Company now possess or will possess information of a confidential or secret nature which has commercial value in the business in which the Company is engaged (hereinafter referred to as "Confidential Information").   Confidential Information for this purpose includes but is not limited to trade secrets, business strategies, processes, data, know-how, inventions, improvements, techniques, formulas, marketing plans, product plans, forecasts, discounts, pricing lists, client and customer lists, and other information relating to the purpose, benefits, use and operations of the Company, whether belonging to the Company or to any of its customers or suppliers. Employee understands that employment with the Company creates a relationship of trust and confidence between Employee and the Company with respect to the Confidential Information that Employee may learn or develop during the period of employment with the Company.

A.    Company Information

Employee agrees at all times during the term of any employment and thereafter, to hold in strictest confidence and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation, without written authorization of the Company's CEO, any Confidential Information of the Company.

1.3    **Obligations Not to Disclose.**  At all times, both while employed with the Company and after the termination of my employment with the Company, Employee will keep in strict confidence all Confidential Information and Employee will not use or disclose any Confidential Information or anything relating to it in whole or in part, nor permit others to use or disclose it in any way, without prior written consent of the Company, except as may be necessary in the ordinary course of performing my duties as an employee of the Company.

1.4    **Obligations upon Termination of Employment.**  Upon termination of employment with the Company for any reason, Employee will promptly deliver to the Company all materials, documents, data, equipment, and other physical property of any nature containing or pertaining to any Confidential Information, and Employee will not take from the Company's premises any such material or equipment or any reproduction thereof.

[Id., ¶ 25 (quoting Confidentiality Agreement, ¶¶ 1.1-1.5)].

10.    Plaintiffs and Meyerhoff also agreed to the following non-competition and non-solicitation provisions in the Confidentiality Agreement:

2.1    **Non-Competition.**  In consideration for and as an inducement to Company to enter into this Agreement, Employee covenants and agrees that during the service

6

and for a period of twelve (12) months following the termination thereof for any reason (the "Non-Compete Period"), Employee shall not, directly or indirectly, anywhere in the Restricted Area, either for Employee or through any other person, have an ownership interest in, manage, participate, operate, control, permit his or her name to be used by, perform services for or otherwise become involved in (whether as an officer, director, manager, employee, investor, partner, proprietor, stockholder, member, trustee, consultant, agent, representative, broker, promoter or otherwise), any Competing Business. ... For the purpose of this Agreement, the term (x) "Competing Business" shall mean any business that develops, sells or otherwise provides any services that compete with (A) products or services developed, sold or otherwise provided by Company during the three (3) year period prior to the date of the termination of my service; or (B) products or services specifically planned to be developed, sold or otherwise provided by Company in the future as documented by a written plan or disclosed to myself as Confidential Information within the two (2) year period prior to the date of the termination of my service, and (y) "Restricted Area" shall mean all states, territories (and the District of Columbia, as applicable) in which Company conducted business during the four (4) year period prior to the date of the termination of my service and all states and territories (and the District of Columbia, as applicable) in which Employee called on customers or performed other services for Company during the same period.

[Id., ¶ 26 (quoting Confidentiality Agreement, ¶ 2.1 (the "Non-Compete Provision"))].

2.2 **Non-Solicitation and Non-Interference.** During the Restricted Period, Employee will not, directly or indirectly, either for Employee or through any other person or entity, (i) induce or attempt to induce any current or former (within the past twelve (12) month period) employee to leave the employ of Company, or in any way interfere with the relationship between such employee and Company, (ii) hire any current or former employee (within the past twelve (12) month period) of Company or (iii) call on, solicit or service any current Company customer or client or competitive with those Services offered by ELAP during the two (2) year period prior to the date of the termination of service or induce or attempt to induce such person to cease doing or decrease its business with Company, or in any way interfere with the relationship between any customer, vendor, broker, third-party administrator or other business relation and Company (including making any negative statement or communication that is intended to or could reasonably be expected to disparage Company).

[Id. (quoting Confidentiality Agreement, ¶ 2.2 (the "Non-Solicit Provision"))].

11.    Meyerhoff accepted Plaintiffs' offer of employment, subject to the Confidentiality Agreement, and began working for Plaintiffs as Director of Business Development.  [Id., ¶ 27].

12.     As Director of Business Development for Plaintiffs, Meyerhoff was responsible for all aspects of maintaining and developing Plaintiffs' relationships with its customers, brokers, and third-party administrator partners.  [Id., ¶ 28].  Meyerhoff was also tasked with expanding Plaintiffs' footprint across the United States and with developing and executing Plaintiffs' sales and marketing strategies, which included cultivating broker relationships, developing sales leads provided to him by ELAP, and identifying and developing relationships with prospective clients, brokers, and third-party administrator partners on a nationwide basis.  [Id., ¶¶ 29-31].

13.     Meyerhoff developed relationships with the entities and individuals identified in paragraph no. 12 above at Plaintiffs' expense, and only by virtue of his employment with Plaintiffs.  [Id., ¶ 32].

14.     During his employment with Plaintiffs, in reliance on the promises made by Meyerhoff in the Confidentiality Agreement and elsewhere and his fiduciary obligations, Plaintiffs granted Meyerhoff access, and Meyerhoff was regularly exposed, to Plaintiffs' confidential, proprietary, and trade secret information, including, but not limited to, Plaintiffs' confidential customer lists, prospect lists, broker lists, marketing strategies, business development proposals, pricing strategies, customer preferences, costs and processes, profit margins, confidential information relating to Plaintiffs' third-party administrator partners, and other confidential business information and trade secrets (collectively, the "Confidential Information").  [Id., ¶¶ 33-34].

15.     With the access identified in paragraph no. 14 above, Meyerhoff became knowledgeable of Plaintiffs' clients, their needs, and their future plans; with Plaintiffs' prospective clients and business development efforts; and with the confidential and proprietary methods and processes used by Plaintiffs in the conduct of its business.  [Id., ¶¶ 35-37].

16.     Plaintiffs have incurred substantial expense since their inception in the establishment, development, and maintenance of their customer relationships, as well as in the identification and development of business prospects, which has allowed them to grow their business to the successful national platform that it now occupies.  [Id., ¶ 38-41].

17.     Plaintiffs have sought to maintain the confidentiality of their proprietary information and trade secrets.  In addition to enforcing their various policies, including, but not limited to, the policies set forth in the Confidentiality Agreement, their acceptable use policy, and their employee code of conduct, Plaintiffs maintain security at all of their offices, including, but not limited to, the following:  requiring the use of keys/passcards to enter their offices; limiting access to confidential and proprietary information to those with a need to know; requiring employees to keep highly confidential and proprietary information locked in their desks or filing cabinets; and requiring employees to use an individual password to enter Plaintiffs' computer network.  Additionally, Plaintiffs audit access to their Confidential Information, including, but not limited to, monitoring computer systems after an employee leaves the employment relationship with Plaintiffs.  [Id., ¶ 42].

18.     As a result of Plaintiffs' actions, Plaintiffs' proprietary information and trade secrets are not readily available to the general public, have not become general knowledge in the health benefits industry, and the disclosure of such information and trade secrets to Plaintiffs' competitors would have a detrimental impact upon the economic health of Plaintiffs.  [Id., ¶ 43].

**Meyerhoff Ostensibly Resigns**

19.     On November 27, 2020, without any notice to Plaintiffs, Meyerhoff abruptly resigned his employment with Plaintiffs as Director of Business Development.  [Id., ¶ 44].

20.     Also on November 27, 2020, Ms. Amy Pellegrin, the above-described Chief Legal Officer for ClaimDOC, sent the above-referenced letter to Troy Sisum ("Sisum"), Senior Vice President and Chief Counsel for Plaintiffs, claiming that ClaimDOC had hired Meyerhoff, effective December 1, 2020.  [Id., ¶ 45].

21.     On November 30, 2020, and December 3, 2020, Plaintiffs wrote to Meyerhoff and ClaimDOC, respectively, reminding them that the Confidentiality Agreement barred Meyerhoff from (a) disclosing any of Plaintiffs' Confidential Information, (b) competing with Plaintiffs, or (c) soliciting any of Plaintiffs' customers, and requesting information from Meyerhoff and ClaimDOC.  [Id., ¶ 46].

22.     On December 8, 2020, counsel for Meyerhoff denied that Meyerhoff took any of Plaintiffs' Confidential Information and claimed that Meyerhoff had not violated the Non-Compete and Non-Solicitation Provisions.  [Id., ¶ 47].

23.     Upon information and belief, the December 8, 2020 communication from counsel for Meyerhoff was evasive and misleading, and did not meaningfully address whether Meyerhoff had in fact taken information belonging to Plaintiffs to ClaimDOC.  [Id., ¶ 48].

24.     ClaimDOC never responded to Plaintiffs at all.  [Id., ¶ 49].

25.     ClaimDOC recruited and hired Meyerhoff knowing that ClaimDOC's employment of Meyerhoff violated the Non-Compete and Non-Solicitation Provisions.  [Id., ¶ 50].

26.     In fact, Ms. Pellgrin admitted that ClaimDOC's hiring of Meyerhoff violates the terms of the Non-Compete and Non-Solicitation Provisions.  [Id., ¶ 51].

27.     Ms. Pellegrin argues, however, that the Non-Compete and Non-Solicitation Provisions should not be enforced as written.  [Id.]

## Meyerhoff's Corporate Espionage Months

28.     Upon information and belief, Meyerhoff accepted an offer of employment from ClaimDOC months before he terminated his employment with Plaintiffs.  [Id., ¶ 53].

29.     During these Corporate Espionage Months, ClaimDOC invited Meyerhoff to internal ClaimDOC sales meetings.  [Id., ¶ 54].

30.     During these Corporate Espionage Months, ClaimDOC provided Meyerhoff his own ClaimDOC email address and account. [Id., ¶ 55].

31.     Upon information and belief, Meyerhoff attended meetings of ClaimDOC's sales team while still employed by Plaintiffs during the Corporate Espionage Months.  [Id., ¶ 56].

32.     Upon information and belief, Meyerhoff participated in ClaimDOC's sales efforts while still employed by Plaintiffs. [Id., ¶ 57].

33.     During the Corporate Espionage Months, Meyerhoff improperly accessed Plaintiffs' Confidential Information.  [Id., ¶ 58].

34.     For example, on November 11, 2020, Meyerhoff improperly accessed detailed financial information prepared by Plaintiffs for Plaintiffs' clients.  [Id., ¶ 59].

35.     Meyerhoff also accessed Confidential Information prepared by Plaintiffs assessing its competitors, including ClaimDOC, during the Corporate Espionage Months.  [Id., ¶ 60].

36.     Meyerhoff also accessed Confidential Information prepared by Plaintiffs concerning markets that he did not service for Plaintiffs during the Corporate Espionage Months. [Id., ¶ 61].

37.     Meyerhoff had no legitimate need or reason to access the above-identified Confidential Information in the course of his duties for Plaintiffs.  [Id., ¶ 62].

11

38.     Upon information and belief, Meyerhoff acquired the above-described competitively sensitive Confidential Information for purposes of disclosing it to ClaimDOC and for use in unfairly competing against Plaintiffs.  [Id., ¶ 63].

## The ClaimDOC Agenda

39.     Upon information and belief, ClaimDOC targeted Meyerhoff for a role as a ClaimDOC corporate spy for purposes of stealing Plaintiffs' business.  [Id., ¶ 64].

40.     Upon information and belief, the above-described conduct by Meyerhoff and ClaimDOC is part of a playbook that ClaimDOC is using to attempt to steal Plaintiff's business.  [Id., ¶ 65].

41.     ClaimDOC intends to build its sales force by poaching Plaintiffs' key employees to unfairly obtain the benefit of the relationships that Plaintiffs paid those key employees to develop for Plaintiffs and Plaintiffs' Confidential Information.  [Id., ¶ 66].

42.     This is the second time in three months that ClaimDOC has induced one of Plaintiffs' key sales employees to work for ClaimDOC in violation of obligations owed to Plaintiffs.  [Id., ¶ 67].

43.     Plaintiffs' sales staff is small, consisting of approximately twenty people, and, upon information and belief, ClaimDOC's sale staff is smaller. Given the small size of the sales groups, each employee poached by ClaimDOC causes significant harm to Plaintiffs.  [Id., ¶ 68].

44.     On July 24, 2020, Plaintiffs learned that another key sales employee, Arif, had resigned from his position to accept a position with ClaimDOC.  [Id., ¶ 69].

45.     Like Meyerhoff, Plaintiffs employed Arif as a Director of Business Development.  [Id., ¶ 70].

12

46.     As with Meyerhoff, Plaintiffs discovered that Arif improperly accessed and disclosed Plaintiffs' Confidential Information, both before and after the termination of his employment with Plaintiffs.  The information accessed by Arif was entirely unrelated to his duties as Director of Business Development, and Arif had no legitimate purpose in accessing it. [Id., ¶ 71].

47.     On August 4, 2020, Plaintiffs filed suit against Arif and ClaimDOC in the matter captioned as HCOS Group, LLC v. Omar Arif, Chester County Court of Common Pleas No. 2020-05003-CT (the "Arif Litigation"), which the parties resolved pursuant to a written Settlement Agreement dated September 9, 2020.  [Id., ¶ 72].

48.     On November 2, 2020, Plaintiffs filed suit against Arif and ClaimDOC, alleging that Arif and ClaimDOC had breached the Settlement Agreement by soliciting Brokers (as defined in the Settlement Agreement) in violation of the non-competition provisions set forth in the Settlement Agreement.  Plaintiffs' claims relating to Arif and ClaimDOC's breaches of the Settlement Agreement remain pending.  [Id., ¶ 73].

49.     Meyerhoff has been an active member of ClaimDOC's sales team since early September 2020, although he did not resign from his employment relationship with Plaintiffs until November 27, 2020.  [Id., ¶ 74].

50.     Meyerhoff is represented by the exact same counsel in this lawsuit as is Arif in the Arif Litigation.  [Id., ¶ 75].

51.     Upon information and belief, ClaimDOC has paid and is paying for the representation of Meyerhoff and Arif in response to the claims asserted by Plaintiffs.  [Id., ¶ 76].

52.     Likewise, ClaimDOC has retained the same counsel to represent it in this dispute as the counsel representing it in the Arif Litigation.  [Id., ¶ 77].

53.     ClaimDOC's actions, both with respect to Meyerhoff and Arif, constitute a clear pattern of conduct involving the exact same scheme, similar tactics, and the exact same personnel aimed at acquiring Plaintiffs' business by theft.  [Id., ¶ 78].

54.     Upon information and belief, Defendants have used and are using Plaintiffs' confidential and proprietary information and trade secrets for purposes of targeting and soliciting Plaintiffs' current and potential customers, brokers, and third-party administrator partners, to induce them to terminate their relationships with Plaintiffs in favor of ClaimDOC.  [Id., ¶ 79].

55.     Upon information and belief, Defendants have continued their misappropriation of Plaintiffs' Confidential Information for purposes of obtaining an unfair competitive advantage over Plaintiffs.  [Id., ¶ 80].

56.     Defendants' misappropriation of Plaintiffs' Confidential Information is an unlawful attempt to capitalize on Plaintiffs' substantial investment in proprietary and confidential business methods, marketing strategies, and client and partner relationships.  [Id., ¶ 81].

57.     Defendants' improper conduct, and its inevitable continuation, interferes with the conduct of Plaintiffs' business, irreparably harms and damages Plaintiffs' business, places Plaintiffs' Confidential Information at risk, and places Plaintiffs at a competitive disadvantage.  [Id., ¶ 82].

58.     On December 22, 2020, Defendants sent an email to Plaintiffs' customers, referral sources, business partners, and Plaintiffs' own employees, including, but not limited to those with whom Meyerhoff worked while employed by Plaintiffs, soliciting business in violation of the Confidentiality Agreement.  [Id., ¶ 83].

59.    As such, it became evident on December 22, 2020, that Plaintiffs will suffer irreparable harm immediately if injunctive relief does not issue, including, but not limited to, lost market advantage, damaged or lost referral and customer relationships, and lost goodwill, because no adequate remedy at law will prevent further wrongdoing and restore the *status quo* that existed before Defendants' unlawful conduct.  [Id., ¶ 84].

## LEGAL ARGUMENT

60.    The Court should grant the Petition and award Plaintiffs the requested injunctive relief because (a) the Non-Compete Provision is *prima facie* enforceable and Meyerhoff breached the Non-Compete Provision by accepting employment from ClaimDOC, and (b) Plaintiffs have satisfied all of the elements required to establish their right to injunctive relief.

### A.    The Non-Compete Provision Is *Prima Facie* Enforceable

61.    "[E]mployment contracts containing general covenants by an employee not to compete after the termination of his employment are *prima facie* enforceable if they are reasonably limited as to duration of time and geographical extent…within such territory and during such time as may be reasonably necessary for the protection of the employer." Bettinger v. Carl Berke Ass'n, Inc., 314 A.2d 296, 298 (Pa. 1974) (citing Jacobson & Co. v. Int. Environment Corp., 235 A.2d 612 (Pa. 1967)).

62.    To be enforceable, the covenant must be (a) reasonable in time, (b) reasonable as to geographic scope, and (c) otherwise reasonably necessary to protect the employer, without imposing an undue hardship on the employee.  Id.

63.    Additionally, the restrictive covenant must be supported by adequate consideration, which is satisfied if the restrictive covenant is agreed upon at the commencement

of the employment relationship.  See Modern Laundry & Dry Cleaning Co. v. Farrer, 536 A.2d 409, 411 (Pa. Super. Ct. 1988).

64.     The reasonableness of the duration and geographic aspects of a restrictive covenant must be determined in light of the nature of the employer's interest sought to be protected.  See Boldt Machinery & Tools v. Wallace, 266 A.2d 902, 907 (Pa. 1976).

65.     "Courts seldom criticize restraints of six months or a year on the grounds of duration as such, and even longer restraints are often enforced."  Id.

66.     In addition, in Pennsylvania, when enforcing restrictive covenants, courts may limit the geographic scope to any extent reasonably necessary for the protection of the employer. See Quaker City Engine Rebuilders, Inc. v. Toscano, 535 A.2d 1083, 1089 (Pa. Super. Ct. 1987) (stating, "an otherwise valid restrictive covenant which is geographically overbroad is 'divisible and enforceable [once it has been limited by the court] to reasonable geographical limits'").

67.     Here, the Non-Compete Provision is reasonable in time as it is limited to one year after the date of Meyerhoff's termination of employment.  See Boldt Machinery & Tools, Inc., 366 A.2d at 907.

68.     Additionally, the Non-Compete Provision is reasonable as to its geographic scope because it is limited to (a) the states in which Meyerhoff contacted customers or performed other business on behalf of Plaintiffs during the term of his employment, and (b) the states in which Plaintiffs operated during the four years preceding Meyerhoff's termination.  [See Complaint ¶ 26 (quoting Confidentiality Agreement, ¶ 2.1)].

69.     Meyerhoff's conduct leading up to the termination of his employment, particularly during the Corporate Espionage Months, demonstrates the necessity of the geographical scope of the Non-Compete.

16

70.     As set forth above, during his employment with Plaintiffs in reliance on his fiduciary obligations and the Confidentiality Agreement, Plaintiffs provided Meyerhoff access to confidential, proprietary, and trade secret information relating to all of Plaintiffs' current and prospective customers, brokers, and third-party administrator partners located in every market that Plaintiffs service across the country.

71.     Upon information and belief, Meyerhoff worked for ClaimDOC's prior to resigning his employment with Plaintiffs, including attending sales meetings and advancing ClaimDOC's competitive sales efforts.

72.     Further, Meyerhoff sought to obtain financial information for several of Plaintiffs' clients for the benefit of ClaimDOC and competitively sensitive information prepared by Plaintiffs about ClaimDOC itself.  That information is confidential and proprietary, and Meyerhoff had no legitimate need or reason to access this information in the course of his duties for Plaintiffs.

73.     The geographic scope of the Non-Compete Provision is, therefore, reasonable and necessary to protect Plaintiffs' interests because Meyerhoff had access to all of Plaintiffs' confidential and proprietary information relating to all of the markets that Plaintiffs' serviced, and not just those markets in which Meyerhoff specifically worked.  See Boldt Machinery & Tools, 266 A.2d at 907.

74.     Further, Meyerhoff agreed to the Non-Compete Provision at the start of and as a condition of his employment with Plaintiffs and, therefore, the Non-Compete Provision is supported by adequate consideration.  See Modern Laundry & Dry Cleaning Co., 536 A.2d at 411.

75.     Finally, Meyerhoff breached the Non-Compete Provision as he accepted employment with ClaimDOC before he left employment with Plaintiffs and worked for ClaimDOC before he resigned from Plaintiffs, and also within 12 months after the termination of his employment with Plaintiffs, within the Restricted Territory.  [See Complaint, ¶¶ 53-63].

76.     Plaintiffs' just learned that on December 22, 2020, Meyerhoff solicited customers, prospective customers, business associated, and even Plaintiffs' own employees on behalf of ClaimDOC in violation of the Confidentiality Agreement.

77.     Accordingly, Plaintiffs are entitled to injunctive relief enforcing the terms of the Confidentiality Agreement, including, but not limited to, the Non-Compete and Non-Solicitation Provisions.  See Bettinger, 314 A.2d at 298.

## B.     Plaintiffs Has Satisfied The Elements For Injunctive Relief

78.     Beyond the *prima facie* validity of the Non-Compete Provision, Plaintiffs have established a right to injunctive relief.

79.     Injunctive relief is an appropriate remedy when the following elements are satisfied:

a.     The injunction is necessary to prevent immediate and irreparable harm that could not be adequately compensated by damages;

b.     Greater injury would result by refusing the injunction than by granting it and issuance of an injunction will not substantially harm other interested parties in the proceedings;

c.     The injunction properly restores the parties to the status as it existed immediately prior to the alleged wrongful conduct;

d.     Plaintiff is likely to prevail on the merits;

e.     The injunction sought is reasonably suited to abate the offending activity; and

f.     An injunction will not adversely affect the public interest.

18

See, e.g., Commw. v. Snyder, 977 A.2d 28, 40 (Pa. Commw. Ct. 2009).

80.     Here, each of the above elements weighs in Plaintiffs' favor.

**1.     The Injunction Is Necessary To Prevent Immediate And Irreparable Harm**

81.     An injury is "irreparable" if it, "[w]ill cause damage which can be estimated only by conjecture and not by an accurate pecuniary standard." West Penn Specialty MSO, Inc. v. Nolan, 737 A.2d 295, 299 (Pa. Super. Ct. 1999) (affirming preliminary injunction enforcing a non-competition provision of an employment contract because employee's "departure signaled a significant loss of business opportunity and market advantage").

82.     "Grounds for an injunction are established where the plaintiff's proof of injury, although small in monetary terms, foreshadows the disruption of established business relations." Id.

83.     "The effect of such disruption may manifest itself in a loss of new business not subject to documentation, the quantity and quality of which are inherently unascertainable." Id.

84.     "Consequently, the impending loss of a business opportunity or market advantage also may be aptly characterized as an 'irreparable injury' for purposes of equitable relief." Id.

85.     Meyerhoff's employment with ClaimDOC violates the Non-Compete Provision because that ClaimDOC provides competitive products and services to the same customers and potential customers in the Restricted Territory (as defined in the Confidentiality Agreement). See Bettinger, 314 A.2d at 298.

86.     Additionally, as set forth above, Plaintiffs will suffer irreparable harm in the form of lost market advantage, lost business opportunities, and the disruption of business relationships, if Defendants continue to violate the Confidentiality Agreement. West Penn Specialty MSO, Inc., 737 A.2d at 299.

19

87.    The December 22, 2020 solicitations sent by Defendants in violation of the Confidentiality Agreement renders the irreparable harm immediate.

88.    Accordingly, Plaintiffs will suffer immediate and irreparable harm unless and until Defendants are enjoined from violating the Confidentiality Agreement.

**2.    Greater Injury Will Result By Refusing The Injunction Than By Granting It**

89.    The irreparable harm that Plaintiffs will suffer if the injunction is denied is greater than any harm that Defendants will suffer if it is granted.

90.    Plaintiffs have spent substantial time and resources promoting and developing their services and products and cultivating their relationships with their customers, brokers, and third-party administrator partners.

91.    In reliance on Meyerhoff's fiduciary duties to Plaintiffs and his execution of the Confidentiality Agreement, Plaintiffs provided Meyerhoff with significant resources to service Plaintiffs' customers and market Plaintiffs' products and services to current and prospective customers, brokers, and third-party administrator partners, and placed him in an important and competitively sensitive position, which allowed him to cultivate these critical relationships.

92.    Additionally, Plaintiffs provided Meyerhoff with access to its Confidential Information, which Defendants are now using against Plaintiffs.

93.    If Defendants are not enjoined, they will continue using Plaintiffs' Confidential Information against Plaintiffs to increase Defendants' unfair competitive advantage, resulting in continuing harm to Plaintiffs in violation of the law.  This became evident on December 22, 2020, when Defendants sent the aforementioned solicitations.

94.    Accordingly, greater injury will result by refusing the injunction than by granting it.  See Allegheny, 826 A2d at 893.

20

### 3.      The Injunction Restores The Status Quo

95.      The *status quo* to be maintained by injunctive relief is the last actual peaceable and lawful uncontested status that preceded the pending controversy.  See Valley Forge Historical Society v. Wash. Mem. Chapel, 426 A.2d 1123, 1129 (Pa. 1981).

96.      Here, the injunction maintains the *status quo* by returning the parties to their positions before Defendants' unlawful interference with Plaintiffs' contractual relationships and Defendants' misappropriation of Plaintiffs' confidential, proprietary, and trade secret information.

### 4.      Plaintiffs Are Likely To Prevail On The Merits

97.      The injunction is warranted here because Plaintiffs are likely to prevail on the merits of their claims as set forth in Plaintiffs' Complaint.

98.      First, Plaintiffs are likely to succeed on their breach of contract claims because (a) Defendants have acknowledged that the Confidentiality Agreement and the Compensation Plan are valid and binding contracts, (b) Meyerhoff breached the Confidentiality agreement by (i) accepting employment from ClaimDOC (in violation of the Non-Compete Provision), (ii) disclosing and using Plaintiffs' Confidential Information (including confidential and proprietary information relating to Plaintiffs' customers, brokers, and third-party administrator partners) against Plaintiffs, and (iii) soliciting Plaintiffs' current and prospective customers, brokers, and third-party administrator partners on behalf of ClaimDOC, and Meyerhoff breached the Compensation Plan by failing to repay Plaintiffs $24,000.00 in advanced commissions that were loaned to him, which Meyerhoff did not earn.  [See Complaint, ¶¶ 85-94].

99.      Second, Plaintiffs are likely to succeed on their breach of fiduciary duty claim against Meyerhoff because, Meyerhoff actively worked with and for Plaintiffs' competitor,

ClaimDOC, while employed by Plaintiffs, misappropriated Plaintiffs' Confidential Information and trade secrets, and solicited Plaintiffs' customers on behalf of ClaimDOC. [See id., ¶¶ 95-100].

100.    Third, Plaintiffs are likely to succeed on their aiding and abetting breach of fiduciary duty claim against ClaimDOC because ClaimDOC knowingly participated in, and gave substantial assistance or encouragement to, Meyerhoff's breach of his fiduciary duty of loyalty that he owed to Plaintiffs, by encouraging and assisting Meyerhoff in misappropriating Plaintiffs' confidential, proprietary, and trade secret information and soliciting Plaintiffs' customers, brokers, and third-party administrator partners on ClaimDOC's behalf. [See id., ¶¶ 101-105].

101.    Fourth, Plaintiffs are likely to succeed on their Pennsylvania Uniform Trade Secrets Act claim because, by and through Meyerhoff's breaches of his duty of loyalty and unauthorized access of Plaintiffs' computer network, Defendants misappropriated and used Plaintiffs' confidential and proprietary information and trade secrets, including, but not limited to Plaintiffs' customer lists, non-public prospect lists, customer names and contact information, customer needs and preferences, pricing information, marketing strategies and materials, broker lists, confidential information relating to Plaintiffs' third-party administrator partners, business methods, business development plans, and other confidential business information. See 12 Pa. C.S. §§ 5301, et seq. [See Complaint, ¶¶ 106-113].

102.    Fifth, Plaintiffs' are likely to succeed on their tortious interference with Plaintiffs' contractual relationships claims because (a) Defendants intentionally interfered with Plaintiffs' contractual relationships with their customers, brokers, and third-party administrator partners as set forth above, and (b) ClaimDOC intentionally interfered with Plaintiffs' contractual

relationship with Meyerhoff by hiring Meyerhoff in violation of the Confidentiality Agreement.
[Id., ¶¶ 114-128].

103.    Sixth, Plaintiffs are likely to succeed on their aiding and abetting tortious
interference with contractual relationship claim, because Defendants each aided and abetted each
other in their intentional interference with Plaintiffs' contractual relationships.  [Id., ¶¶ 129-134].

104.    Seventh, Plaintiffs are likely to succeed on their unfair competition claim because
Defendants intentionally sought to divert business away from Plaintiffs and to Defendants
through wrongful means, including, but not limited to, through Meyerhoff's breaches of his
fiduciary duty of loyalty and by misappropriating Plaintiffs' confidential, proprietary, and trade
secret information.  [Id., ¶¶ 135-139].

**5.      The Injunction Is Reasonably Suited To Abate Defendants' Offending Activity**

105.    If granted, the injunction will require Meyerhoff to honor his contractual
commitments and will preclude Defendants from violating the law by prohibiting their continued
use and disclosure of Plaintiffs' confidentiality, proprietary, and trade secret information.

106.    Accordingly, the injunction is reasonably suited to abate Defendants' offending
activity.  See Allegheny Anesthesiology Assoc. Inc., 826 A.2d at 893.

**6.      The Injunction Will Not Offend The Public Interest**

107.    Finally, the injunction will not offend the public interest.  It will, instead, further
the public interest in ensuring that contracts are honored and enforced and protecting against the
misappropriation of trade secrets, as codified by the Pennsylvania Uniform Trade Secrets Act, 12
Pa. C.S.A. §§ 5301 et seq.; see also Ambridge Water Auth. v. Columbia, 328 A.2d 498, 500 (Pa.
1974) (holding, "[f]undamental in our law of contracts is the axiom that parties may write their

own contracts and that it is the function of the courts to interpret those contracts and to enforce them as made").

108.     For these reasons, and those set forth fully in his verified Complaint, Plaintiffs satisfy all of the elements required to obtain a preliminary injunction.

**WHEREFORE,** Plaintiffs respectfully request that the Court grant the Petition and award Plaintiffs the following relief:

(a)     Temporary injunctive relief effective until the Court rules on Plaintiffs' request for preliminary injunctive relief, prohibiting Defendants from violating the Confidentiality Agreement;

(b)     Preliminary injunctive relief (1) prohibiting Meyerhoff from working for ClaimDOC, or any other employer within the Restricted Territory (as that term is defined in the Confidentiality Agreement attached to Plaintiffs' Complaint as Exhibit B) for one full year from entry of the order; (2) prohibiting Defendants from using or disclosing Plaintiffs' Confidential Information, and (3) prohibiting Defendants from deleting or destroying any of Plaintiffs' Confidential Information until further Order; and

(c)     any other relief that the Court deems just and reasonable.

**FOX ROTHSCHILD LLP**

Dated:  December 23, 2020              By:/s/ *Lauren P. McKenna*
                                        Lauren P. McKenna, Esquire
                                        Samuel W. Cortes, Esquire
                                        Danielle E. Ryan, Esquire
                                        Attorney I.D. Nos. 59145/91494/314229
                                        747 Constitution Drive
                                        Exton, PA  19341
                                        Telephone:  610-458-7500

24

**VERIFICATION**

I, Tom Wittick, hereby state that I am authorized to make this Verification on behalf of Plaintiffs in my role as Senior Vice President, Growth. I have read the foregoing Petition for Temporary and Preliminary Injunctive Relief and I know the contents thereof. The statements contained in the foregoing Petition for Temporary and Preliminary Injunctive Relief are true and correct to the best of my knowledge, except to those matters stated on information and belief, and as to those matters, I believe them to be true. I further understand that false statements herein made are subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities.

*Thomas J. Wittick*
By:  Tom Wittick

Dated: December    , 2020